### Edmund Quirk v. Almon Thomas and Others,
A N D
### John Greusel v. The Same.

Bills by purchasers from the grantee against the heirs and administrator of the grantor, to re-form a deed, by correcting the description of the lands, which, by reason of the omission of four out of fourteen courses and distances, embraced but a small portion of the lands intended to be conveyed. Defense (which was fully proved), that the deed was made without consideration, and for the purpose of defrauding the creditors of the grantor. There was no proof of debts existing against the estate of the grantor at the time the bills were filed, but the administrator was taking proceedings in the probate court for the sale of the lands—for what purpose, did not appear. The deeds to complainants described the respective parcels purchased by them correctly. Both parties to the fraudulent conveyance were dead before the mistake was discovered. A full consideration was recited in this deed; the grantee assumed possession and control of the premises under it; and the grantor, who died before complainants purchased, had always, after giving the deed, represented, and twice made oath, that the land belonged to the grantee.

### By MANNING J.; CAMPBELL J. concurring.

That one is a purchaser for a valuable consideration without notice, is not of itself an equity on which a bill may be sustained for relief. It is a shield to protect a party, but can not be made a basis of attack.

The reason of this rule is, that the effect which the law gives to a purchase without notice, is not a perfect right in itself, and, therefore, will not sustain an action at law or a bill in equity, but may, in certain circumstances, be used by a defendant to stay the interposition of the court, on the ground that he is equally entitled with the plaintiff to its protection.

Complainants, as purchasers from the fraudulent grantee, have all his rights, at law and in equity, and no more. As the court could not have corrected the mistake in favor of the grantee, who was a party to the intended fraud of the grantor, neither can it in favor of complainants.

It is immaterial, in such case, whether there are or are not creditors of the fraudulent grantor now to be injured. It is the corrupt intention—the illegal object had in view—the wrong intended, and not the wrong done—that stays the hands of the court from giving effect to the illegal contract.

QUIRK v. THOMAS.

A court of equity will not decree the specific performance of a voluntary contract, nor will it correct a mistake in a defective execution of it, where there is no intervening equity. In this case, the most complainants can claim, is, that they are, in equity, the assignees of such voluntary contract. As such assignees, they would take it subject to all its vices, and to all equities existing between the parties to it.

The deed in question having been recorded before complainants bought, they are chargeable with notice of every thing that appears on the face of the record, and can not, in law, be said to have been ignorant of the mistake. And, independent of the registry laws, they are chargeable with notice of whatever is in the deeds through which they claim. They are not, therefore, in law, *bona fide* purchasers without notice.

What complainants were informed, by third persons, of the declarations of the grantor, that he had conveyed the whole premises to the grantee by this deed, was mere public rumor; and there is no equity growing out of it in their favor.

The Statute of Frauds, declaring a conveyance to defraud creditors void as against creditors only, is merely declaratory of the common law, by which all contracts, made in violation of law, or contrary to public policy, are illegal, and consequently void, and, when executory, will not be enforced, or relieved against when executed. Where such a contract has been executed in part, the law gives effect to it so far as executed, and holds it void so far as it remains unexecuted.

## By CAMPBELL J.

If the grantee in the fraudulent deed had any rights outside of the land therein described, they arose from the equity to have a new deed, conforming to some right which was not perfectly assured by the deed as executed. The deeds to complainants would be operative to pass no more than their grantor possessed, which would be the legal estate in the lands actually covered by his deed, and any claim he might have to the lands not covered by it, and to which, consequently, he did not have the legal title.

The ground of relief in case of mistake is placed upon the same basis as that of specific performance, and the mistake is corrected by establishing the original right to a conveyance, or other instrument, under some agreement, which, by reason of the mistake, has not been fully carried out. To make out the mistake, it is necessary to make out the contract, that the court may see how far it has failed in the performance.

As a general rule, rights which exist against an ancestor, will equally exist against his heirs. But the ancestor having died before complainants acquired their interests, they could have no rights against him, and can, therefore, have none against his heirs, by reason of his acts or representations not made to complainants, or to any one through whom they claim.

## By CHRISTIANCY J.; MARTIN Ch. J. concurring.

The heirs of a grantor stand precisely in the condition of their ancestor, and can avail themselves of no defense which would not have been equally available to him. And there being no evidence of debts against the estate, and nothing to show that the administrator is seeking the property at the instance of creditors, the administrator stands in no better position than the heirs.

Contracts are treated as void, at common law, on the ground of public policy only, and the rule *ex turpi causa non oritur actio* is subject to all the limitations and qualifications which sound public policy may dictate. Courts may sustain, or refuse to sustain, an action upon such contracts, as may be most consistent

QUIRK *v.* THOMAS.

with sound policy, and best calculated to discourage and suppress such violations of the law. The rule itself can not be made an engine of wrong and injustice in the hands of the wrong doer against innocent parties, nor set up to the prejudice of any party guiltless of all participation in the wrong, or whose rights have been acquired without notice of it.

Where, in case of a transaction merely illegal as against public policy, the party seeking relief is innocent of the fraud intended, the case is to be considered, in all respects, as if there had been no fraud, and the contract between the original parties, under one of whom complainant claims, had been made in good faith, and for good consideration.

To enable a party to such a transaction to show his own fraud in his own defense, the complainant must not only be *in delicto,* but *in pari delicto;* for though he may to some extent have participated in the illegal transaction, yet, if not equally guilty with the defendant, or, at least, if there be strong mitigating circumstances in his favor, the defendant will not be allowed to avail himself of this defense.

Where a consideration is expressed in a deed, and complainants have purchased from the grantee on the faith of it, the grantor, as against them, is estopped from denying such consideration.

On a bill to correct a mistake in a written instrument, no proof of any actual previous agreement need be given; but what was the understanding of the parties, and what the instrument was intended to be, may be inferred entirely from the instrument itself, the subject-matter, the surrounding circumstances, and the subsequent acts of the parties.

The reason of the rule that the assignee of a chose in action must be presumed to have notice of what the rights of the parties to it really were, substantially fails where the one party understands that he is selling, and the other that he is purchasing, *land,* and not a mere *contract* respecting land. The rights of the purchasers, in such case, should be governed, as to notice of every thing affecting the rights of prior parties, by the same rules which apply to conveyances of lands.

The purpose of the registry laws is not to give notice as between the grantor and his grantee, immediate or remote, for the protection of the grantor, but as between prior and subsequent purchasers and incumbrancers from the same grantor, and for the protection of purchasers.

The deed sought to be corrected, or the record thereof, was no more notice to complainants of the mistake, than to the grantee, at the time of taking it. And where the question arises without intervening equities, and the mistake is one eminently calculated to mislead, and the parties can not be charged with gross negligence, the rule that the purchaser is bound, at his peril, to take notice of the defects in the conveyances through which he claims, can not apply, since, otherwise, the very fact that such a mistake has occurred would be a bar to its correction.

The acts of the grantor in giving a deed, the description in which was calculated to mislead, and did mislead, in reciting in the deed a full consideration, and in putting and continuing the grantee in possession with all the *indicia* of ownership, were continuing representations which did not end with his death, and that event took nothing from their effect. They operate, as to those who have been deceived by them, as equitable estoppels upon his representatives.

The rule of equitable estoppel by representations, is not confined to such as are made directly to the parties acting upon them. Whether direct or indirect, in the presence or in the absence of the parties, is immaterial, so that they be calculated and intended to produce, and do produce, the end.

QUIRK *v*. THOMAS.

Where one has been induced to become a purchaser by the misrepresentation of another ignorant of his own right, but where he ought, as a prudent man, to have had notice of it, equity will grant relief to the purchaser. But the cases at bar are much stronger, and stand upon the ground of that class of cases where the party, knowing his rights, willfully conceals them, encourages another to purchase, and when the purchase has been made on the strength of the representation, seeks to take advantage of his own wrong, to the injury of the purchaser. The fraud of the party can not shield him where his ignorance would not. When others have been induced to purchase on the strength of his representations, he shall not be allowed to excuse himself on the plea that he only meant to defraud creditors, when the allowance of the excuse would defraud purchasers also.

A purchase for a valuable consideration is ground for affirmative relief in equity, where the equities of the complainant are superior to those of the defendant.

## By MARTIN Ch. J.

As a general rule, courts of equity will not interpose to enforce a fraudulent contract, nor to assist the parties to it in any manner; but they will protect *bona fide* purchasers against all equities not superior, and assist them against all which are inferior.

The equities of these complainants are altogether independent of, and superior to, those of their grantor, and depend upon no contract between him and his grantor, but upon the facts of an attempted and supposed conveyance, possession under it, the purchase by complainants for value, and the inducements to such purchase held out by the acts and representations of the original grantor. In the case of a mere voluntary conveyance, accompanied by delivery of possession, a subsequent purchaser would be entitled to the remedy here sought, though no contract had ever existed.

The contract of conveyance, if any ever existed, must be held, in this case, to have been executed, so far as these complainants' interests are to be affected. In their behalf, the maxim of equity, that what was intended to be done will be considered as done, will have its full force.

*Heard October 8th, 13th, and 14th. Decided December 9th.*

Appeals by defendants from the Wayne Circuit in Chancery.

The facts in the two cases being substantially the same, and the testimony identical, they were heard and decided together.

The bill in the first entitled cause sets forth, That on the 14th day of February, A. D. 1848, Thomas Alanson Thomas (called hereinafter Alanson Thomas), claiming to own, and being possessed of and controlling, a tract of land containing fifty acres, in the bill particularly described, and situated in Dearborn, Wayne county, proposed to sell the same to complainant, and that complainant, believing the land to belong

to said Alanson, purchased the same of him for the consideration of $480 in hand paid; that said Alanson and his wife executed to complainant a conveyance thereof, of the date aforesaid: That complainant immediately went into possession of said premises, and has continued to occupy the same to this time: That at the time of said conveyance, said Alanson lived upon, and occupied and controlled, the farm of which said premises was a part, and so had ever since the year 1838: That Aaron Thomas, the father of said Alanson, lived on the said farm, near the residence of said Alanson, at the time of said purchase, and that, at that time and long previous thereto, and up to the time of his death, which occurred in May, 1847, said Aaron stated and gave out, that he held and owned no interest in said farm, but that he had sold and conveyed the same to Alanson, and said Alanson also claimed that he owned and held the same by title derived from his father. The bill further sets forth, That on the 18th day of June, 1838, said Aaron was the owner of said farm in fee simple, and proposed to sell the same to said Alanson for $5000, which proposition was accepted; and said Aaron, with the intent and design of conveying the whole of said farm to Alanson, executed and delivered to him a deed, expressing therein a consideration of $5000; which said deed was signed by Betsey Thomas, wife of said Aaron, now Betsey DeLong, with the design of relinquishing her right of dower in said farm: That the description in said deed, was taken from the original patent from the United States of the said farm, and that it was executed, delivered, and received, in the full belief by all the parties, that the whole land patented, except about 100 acres previously sold, was thereby conveyed: That the whole premises embraced in the patent (all of which, except the parcel before sold, was intended to be conveyed by said deed) included 437 6-100ths acres, but, by a mistake in drafting said deed, a number of courses and distances were wholly omitted, in consequence of which a small fraction only of the farm was

in fact conveyed: That Alanson Thomas caused said deed to be recorded, and continued in possession under it of the whole land, except the portions from time to time sold by him, until his death, which occurred October 1st, 1850; and that both he and Aaron Thomas died without any suspicion of the said mistake: That Aaron uniformly, in speaking of said premises, gave out and represented that he had conveyed the same to Alanson; and in a certain suit in the Wayne Circuit Court, wherein Ebenezer Hurd was plaintiff and said Aaron defendant, and also in a certain proceeding in the Court of Chancery, in favor of Philip Warren against Aaron and Alanson, said Aaron made oath that he had conveyed all his interest in the premises to Alanson: That complainant purchased that portion of said farm bought by him, and paid for the same, in good faith, and before said mistake was discovered: That in fact the discovery of the mistake was first made by Titus Dort, administrator on the estate of said Alanson, in the year 1851: That since the discovery of such mistake, the widow and heirs of said Aaron have procured the appointment of the defendant David McGibbon, by the Probate Court of Wayne county, as administrator on the estate of said Aaron, and that said administrator now claims that the premises so sold to complainant belong to the estate of said Aaron, and has applied to the said Probate Court for license to sell the same as the property of said estate: That said administrator has also brought, in the Wayne Circuit Court, an action of trover for wood and timber appropriated by complainant to his use, from said premises.

And complainant prays for a correction of said mistake, so far as it affects the premises so purchased by him; that the widow and heirs at law of said Aaron (who are made defendants) be restrained from disturbing complainant in the possession of said premises; that the said administrator be enjoined from further proceeding on his application for license to sell the said land, and from further prosecuting said action of trover; and for other and further relief.

The bill in the second case is substantially the same, — complainant's purchase being made September 7th, 1850, and including about forty acres.

Preliminary injunctions were issued as prayed, to restrain the legal proceedings being taken by McGibbon.

To these bills, Betsey DeLong filed a disclaimer, she having released to Alanson subsequent to the decease of Aaron, her former husband. Several of the heirs were infants, and filed, by their guardian *ad litem*, the usual general answer. Two were non-residents, and did not appear, and the others answered, denying many of the facts set up in the bill, and alleging that the deed of June 18th, 1838, was made to defraud the creditors of Aaron Thomas, and that complainants bought with notice of that fact, as well as of the mistake.

. McGibbon defended by plea and answer. He alleged that the last mentioned deed was given by Aaron, and accepted by Alanson, for the sole and only purpose of hindering, delaying, and defrauding the creditors of Aaron, who was then largely indebted; that no consideration whatever was paid for the same, and that nothing was ever said, sworn, or done, by said Aaron or Alanson, tending to show a sale of said lands, except for the purpose of consummating the said fraud; of all which complainants had notice before their respective purchases.

The causes having been put at issue, testimony was taken therein, in substance, as follows:

*Thomas A. Sweeney* had a demand against Aaron Thomas, and called for payment. Aaron told him he had sold all his property to Alanson, who was to pay the debts. Witness then went to Alanson, who paid the demand. This was in 1841. He had another demand against Aaron, which originated in 1841, and was paid by Alanson in 1849. He frequently talked with both Aaron and Alanson about the property after 1838, and the story they always told was that Alanson owned it. He frequently bought farm produce

there, and was always directed by Aaron to Alanson as the owner. The common report in the neighborhood was that Alanson owned the property, and from that report he should not have hesitated in going to Alanson to buy the farm which Aaron had formerly owned. Aaron lived on the premises, in what was called the old homestead, until he died. Alanson lived in the family with his father until after he was married —in 1839 or 1840. Alanson had sore eyes for several years. It was whispered in the neighborhood that Aaron conveyed the property to Alanson to keep it beyond the reach of Dr. Hurd, who was a creditor of Aaron.

*Josiah Dort* had heard both Aaron and Alanson say, between 1838 and 1844, that the farm belonged to Alanson. Aaron frequently said in public places that he had sold his old farm to Alanson, and the farm was reputed to belong to Alanson after 1838. Alanson's eyes were at times so bad as to unfit him for business. Witness does not know that Alanson had any property previous to the farm being deeded to him. Some of the neighbors said the property was conveyed to Alanson to keep it away from creditors, and some denied it. Complainant Quirk moved into the neighborhood in 1831, and has lived there ever since.

*John McVay* worked more or less on the farm every year after 1825; after the farm was said to have been sold to Alanson, witness was paid for the labor by him. Alanson managed the farm after that, and Aaron frequently said he had conveyed to Alanson. If any one applied at the farm to purchase any thing, he was referred to Alanson. About a year before Aaron died, when the collector called for the taxes, Aaron told him he had nothing to do with it, and sent him to Alanson. Aaron told the witness he conveyed the farm to Alanson to keep it away from Dr. Hurd, who wanted to rob him. Does not know that Alanson had any property previous to the farm being conveyed to him.

*Titus Dort* knew Aaron and Alanson Thomas. The former died in February, 1847, and the latter in October, 1850. All

the public transactions after June, 1838, were in the name of Alanson, and Aaron always said Alanson owned the farm, and had the management of it. When Aaron did business, he represented himself as agent of Alanson. From 1838 to the death of Aaron, it was common public report that Alanson owned the place. Witness was supervisor of Dearborn in 1844, and assessed the property to Alanson, by direction of Aaron, except a span of horses and a wagon, which Aaron claimed as his own. In 1839, Isaac Sherman commenced an action of trespass, before the witness as justice, against one Lawrence, alleging that the latter had trespassed upon his land adjoining a part of the Thomas farm, which Lawrence had leased of Alanson. Aaron was sworn as a witness in this suit, and testified that Alanson had leased a part of the farm to Sherman, and that he (Aaron) had no interest in the matter. Witness was appointed administrator on the estate of Alanson in the fall of 1850, and then discovered the error in the deed from Aaron to Alanson, and notified complainants of it, who expressed their astonishment at the mistake. Communicated it, also, to Betsey DeLong, who stated that she had never heard of it before. Aaron Thomas told witness he did not intend to be forced to pay Dr. Hurd, but that he would pay him all he owed him. The farm, agricultural implements, &c., were worth $2000 or $2500. It was the general impression in the neighborhood that the farm was conveyed to Alanson to keep it beyond the reach of Aaron's creditors. From 1838 to 1847 witness would not have been willing to have bought of Alanson without full examination as to the title. From 1837 to the latter part of 1838, Alanson's eyes were so bad as to incapacitate him from doing business. Witness found among the papers of Aaron Thomas, after his decease, another deed of the farm from Aaron to Alanson, dated in 1836, and conditioned for the support of Aaron and his family. Alanson told witness that Quirk had paid up for the land bought by him, and Greusel paid witness, as administrator, all but $100.

*Nelson Klumph* talked with Aaron in 1841 about buying a piece of the farm, and was informed that Alanson owned it and could give a good title to it. In the summer of 1844 or 1845, witness went to the farm to buy cattle. Alanson was away from home, and Aaron said the cattle were Alanson's, and witness must come again. Witness did go again, and bought them of Alanson. Witness frequently bought cattle and produce at the farm, and was always informed by Aaron that the property belonged to Alanson, and that Alanson had the selling of it. From 1840, Alanson appeared to have the control and management of the farm until his death, and witness believed him the owner. He was reputed in the neighborhood to be the owner.

*Daniel D. Tompkins* was a constable, and, as such, in 1843, or before, went with an execution against Aaron Thomas, to search for property. Aaron told him every thing belonged to Alanson. Alanson claimed all the property, and witness returned the execution unsatisfied. There were reports in the neighborhood that Aaron had conveyed the property to Alanson to keep it away from creditors.

*John F. Monroe* exhibits a plat of the farm, and shows that but a small triangular piece of it is covered by the description contained in the deed from Aaron to Alanson. The third, fourth, sixth, and seventh courses, of the fourteen contained in the patent, are omitted in this deed.

*Christopher Markie* came with Greusel to Michigan, in 1848, and heard some portion of the talk between him and Alanson about the purchase made by Greusel in 1850.

*Joseph Lorrain* often heard Aaron say the farm belonged to Alanson; this was from 1838 to 1844.

*Gilbert Lognyan* was frequently told by Aaron, that the farm belonged to Alanson. It was the talk among the neighbors that Aaron had put his property out of his hands to defraud his creditors.

*Denison Miller* leased part of the farm from Alanson, in

1845, for two years. Aaron afterwards wanted to buy the lease of him, but they did not agree upon the price.

*James Nowlin* drew the deed from Aaron to Alanson; Alanson was not present. Aaron told witness he thought he would deed over his farm to his poor blind boy. He directed a deed to be drawn, and a bond and mortgage back for the same consideration stated in the deed, and said he would take the bond and mortgage home for Alanson to execute. Witness supposed the description contained in the deed to cover the Aaron Thomas farm, though he does not recollect what he had to draw it from. He never heard, or supposed, it did not cover the farm until after the death of Alanson. Aaron often spoke of the farm as Alanson's. When Aaron gave directions about the deed, he commenced speaking of his difficulty with Dr. Hurd, but witness checked him, as a matter of policy for Aaron. It was commonly talked in the neighborhood, that Aaron conveyed the farm to Alanson to keep it away from his creditors.

*Henry T. Backus* became professional adviser for Aaron and Alanson as early as 1838 or '39. The deed from Aaron to Alanson, as well as the patent, was frequently in the possession of witness, but he was never aware of the discrepancy in the descriptions until after the death of Alanson, when his attention was called to it by Titus Dort. Both Aaron and Alanson frequently spoke to witness of Alanson being owner of the property under this deed from his father. Both Quirk and Greusel, prior to their respective purchases, inquired of witness whether they could get good titles from Alanson Thomas, and was told that they could. Witness has no recollection that any thing was ever said to him by Aaron or Alanson about the farm being deeded to the latter to keep it beyond the reach of Aaron's creditors. In the transaction of all business relating to the farm, so far as witness observed, it was done in the name of Alanson.

QUIRK v. THOMAS.

*Betsey DeLong* was married to Aaron Thomas in 1830. Alanson was then about twenty years old. He had no home, except with his father, until after 1838. He was not able to support himself, and was supported by his father. He paid no consideration for the deed. It was made to keep Dr. Hurd from taking the place on execution. It was understood Aaron was to have it back again when he had settled with Hurd. Before Quirk bought, witness told Mrs. Quirk all about the object of the conveyance to Alanson. Witness was opposed to signing the deed, but Aaron said he would have the farm back within a year. Aaron managed the farm the same after the deed as before, and when Alanson wanted any thing on the farm, he either borrowed or bought it. After settling the Hurd matter, Aaron did not take back the property, on account of another claim for which he was liable. Alanson got married, and went to live in a house on another part of the farm about 1840. Witness threatened Alanson with litigation about the farm after her husband's death, and he compromised with her. Aaron, during his lifetime, furnished the money to pay the taxes on the premises.

*James Condon* heard a conversation between Greusel and one Irwin, in 1848, in which Greusel said he had been to look at the premises subsequently bought by him, and thought he should buy them. Irwin told him he should be afraid of difficulty with the title, as the land was understood to have been conveyed to Alanson to keep it away from creditors. Greusel said he thought things looked fair, and he should risk it.

Besides the evidence of this witness, 'there was some further testimony which defendants claimed had a tendency to show that Greusel must have had doubts of his acquiring a perfect title by his purchase.

*Jesse A. Hicks* heard both Aaron and Alanson say the object of this conveyance was to prevent Hurd collecting a judgment against Aaron. Witness occasionally worked for Aaron on the farm, down to 1850.

*James Gall* was asked by Quirk to loan him $100 to make a payment on his purchase. Witness told him he had better inquire into the title before he paid his money. Quirk told him he had done so, and thought he could get a good title by getting a quit-claim from the Warren and Stacy heirs. Quirk told witness that he had already bought. It was rumored in the neighborhood that the land was conveyed to Alanson to keep it away from Aaron's creditors, but witness did not mention these rumors to Quirk.

*George Throop* received from Aaron Thomas and his wife the taxes on the farm for 1844 and 1846. They were assessed to Alanson.

Considerable other testimony was adduced to show the fraudulent character of the conveyance from Aaron to Alanson, and the rumors and talk in the neighborhood on the subject. Proofs were made also, of improvements by complainants on their purchases respectively. The proceedings in the two suits mentioned in the bill were also given in evidence as follows:

*Hurd v. Aaron Thomas.* Suit brought in 1833, to recover the amount of a physician's bill. Judgment January 12th, 1834, for $468. October 8th, 1845, execution levied upon the premises in question, to satisfy a balance claimed due on the judgment. February 24th, 1846, affidavit made by Aaron Thomas that a levy had been made on the premises of Alanson, as the property of Aaron, and that the judgment had been paid by the delivery to Hurd of farm produce from time to time. Alanson also made affidavit to the delivery of the produce, and the court ordered the execution returned satisfied.

*Warren v. Aaron and Alanson Thomas.* Bill in chancery to quiet in complainant the title to a certain portion of the farm, claimed by him. In January, 1845, defendants answered under oath, claiming adverse possession in Aaron until he conveyed to Alanson, and in the latter since. Aaron disclaimed title, and Alanson claimed to be owner.

The causes being brought to a hearing in the court below, in January, 1857, decrees were made in accordance with the prayer of the respective bills, and defendants appealed.

The following opinion was delivered in the court below:

Douglass, Circuit Judge:

After having gone over the voluminous testimony in these two cases, I feel no doubt as to how they should be decided. The facts appear to be these:

In 1838, Aaron Thomas, who was seized and possessed of a certain tract of land on the river Rouge, known as the Thomas Farm, executed a deed to his son Alanson, which was intended by both parties to be a conveyance of the farm; but the description in this deed, in consequence of the omission of certain courses and distances, embraced but a small portion of it. This deed was executed without consideration, and for the sole purpose of defrauding the creditors of the grantor. From that time until the death of Aaron Thomas, in 1847, both parties gave out to the world that Alanson was the owner of the property. Both Aaron and Alanson lived upon the farm, the latter being generally held out to be the proprietor and manager thereof. On the death of his father, Alanson set up title to the whole farm as against the widow and other heirs, and held undisturbed possession until his death.

In February, 1848, Alanson conveyed forty acres off from the rear part of the farm to the complainant Quirk. On the 9th of September, 1850, he conveyed another forty acres, lying on the river Rouge, to the complainant Greusel. Each of these conveyances was founded upon a valuable consideration.

In October, 1850, Alanson Thomas died. Titus Dort was appointed his administrator. In the performance of his duties as administrator, Dort discovered the defect in the deed from Aaron to Alanson, which, up to this time, had

6 Mich. — G.

been wholly unknown to Aaron Thomas, his widow, and heirs, and also to both Quirk and Greusel. Dort, thereupon, filed a bill to have the description in this deed corrected, but the decree asked for was denied on the ground that the conveyance was fraudulent.

Quirk and Greusel have filed the present bills to obtain similar relief, so far as may be necessary to perfect the title of the respective portions, purchased by each of Alanson Thomas. They claim that, conceding the fraudulent purpose of the deed from Aaron to Alanson, they are entitled to relief as purchasers in good faith from Alanson, without knowledge either of the mistake in that deed, or of the fraud.

That each purchased in ignorance of the mistake in that deed, there can be no doubt: they certainly would not have purchased if they had known it. It is true the deed was on record, and by careful examination they might have discovered the error, but when I consider the number of the courses and distances in the correct description of the Thomas farm, the fact that the error had escaped the vigilance of Aaron Thomas's creditors for upwards of twelve years, and had not been discovered by his widow and heirs, whose interests and feelings strongly proposed scrutiny, and the fact that Alanson had been so long in possession and apparent ownership of the property, I can not say that there was any such want of care and vigilance on the part of the complainants as ought to deprive them of relief, if otherwise entitled to it.

It is again claimed in defense, that each of the complainants is chargeable with constructive notice that the conveyance from Aaron to Alanson was without consideration and for the purpose of defrauding Aaron's creditors. What is sufficient to constitute such notice, it is impossible, from the nature of the case, to define with much precision. But it is well settled that the mere want of caution is not notice; that though willful abstinence from inquiry, or any other act of gross negligence, may be treated by the court as evidence of fraud, it is not the same thing as fraud; that the

party may have acted *bona fide*, and if he has done so, there is no equity against him. And it seems that the mere notice of a fact which may or may not, according to circumstances, be held in a court of equity to amount to fraud, will not affect a purchaser for value denying actual notice of the fraud.—*Adams Eq.* 158, 159; *Champ v. Poupard*, and *Doyle v. Stephens & Field, decided in this Circuit.*

There is another view in respect to notice which it is material to consider in examining the present cases, and that is, that a parol notice, in order to be binding, must proceed from some person interested in the property — that a purchaser is not bound to attend to vague rumors, or to statements of mere strangers. — *Bernhardt v. Greenshield*, 28 *Eng. L. & Eq.* 77.

No doubt from the time of the execution of the deed from Aaron to Alanson, in 1838, suspicions were very generally entertained and expressed in the neighborhood of the real nature and objects of that conveyance. Alanson's age (he was then but about twenty-one), his poverty and his blindness, and the fact of Aaron's indebtedness, which were probably pretty well known, were well calculated to excite such suspicions. Quirk lived in the neighborhood from that time until his purchase from Alanson in 1848, and probably knew some or all of these circumstances, and had heard them talked about. Gall says he advised Quirk at the time the latter purchased, to inquire into it, and see if he could get a good title, before he paid his money. Mrs Thomas, the widow of Aaron, tesifies that before Quirk purchased, she told Mrs. Quirk all about the objects and purposes of the conveyance from Aaron to Alanson. Upon the principles before laid down, the evidence, independent of the testimony of Mrs. Thomas, would be altogether insufficient to show notice to Quirk. With only such knowledge as he may be supposed to have had from other sources, I think no man of common prudence would have hesitated to purchase from Alanson Thomas, after he had been in undisturbed possession and apparent ownership for about

twelve years. He would naturally have presumed that his own and other people's suspicions were not well founded.

I have great doubts as to Mrs. Thomas's credibility in respect to her statements to Mrs. Quirk; but conceding this portion of her testimony to be true, I think the information she communicated to Mrs. Quirk is not sufficiently brought home to Quirk to charge him with notice, in the face of the positive denials of his answer.

As to Greusel, he did not come into the neighborhood until 1848—after Alanson had been in the possession and apparent ownership of the property for ten years. His pur-chase was not made until 1850, three years after the death of Aaron Thomas, during which time Alanson had occupied and enjoyed the property as his own. He is not shown to have received any information in respect to the fraudulent nature of the deed of Aaron Thomas, from any person having any interest in the property. Most clearly, I think, he is not chargeable with notice.

I am, therefore, of opinion that both complainants are entitled to the relief prayed.

*Backus & Harbaugh*, for complainants :

1. Mistake is a proper subject of equity jurisdiction, when satisfactorily proved.— *Walk. Ch.* 102; *Willard's Eq.* 73; 1 *Paige*, 278; 9 *Cow.* 747.

2. The burden of proof is on defendants, to show the conveyance to Alanson Thomas fraudulent, and notice of the fact, as well as of the mistake, to complainants. With-out proof of such notice, complainants would not be affected by the fraud, either at common law or by the statute.— *R. S.* 1838, *p.* 332; *R. S.* 1846, *p.* 328; *Walk. Ch.* 465; *Wil-lard's Eq.* 246; 1 *Johns. Ch.* 328; *Story Eq. Juris.* 375; 2 *Mason*, 252.

3. Fraud, or notice of fraud, will not be presumed, but must be proved.—*Story Eq. Juris.* § 190; *Willard's Eq.* 148. The notice must be something more than vague rumor,

— *Willard Eq.* 251; 2 *Lead. Cas. in Eq.* 111; 28 *Eng. L. & Eq.* 77.

There is here no pretence that complainants had any notice of the mistake. As to the fraud, the question is, Had they such notice of it as will charge them with fraud in the purchase? The testimony brings this within none of the cases to be found in the books on the subject of notice. Notice to Quirk's wife was not notice to him.—1 *Hill*, 567.

*Levi Bishop*, for defendants:

1. Fraud vitiates all compacts and agreements, and even the most solemn adjudications. All contracts and conveyances of real property, to delay, hinder, and defeat creditors, are void on the ground of fraud. And as all parties, privies, and purchasers with notice, are *in pari delicto*, the courts will not relieve them, but will leave them in the same position where their own acts have left them. In other words, the courts will not lend themselves to carry into effect fraudulent and illegal transactions. — 8 *T. R.* 575; *Cowp.* 790; 1 *East*, 96; 3 *B. & P.* 35; 7 *East*, 449; 12 *East*, 396, 404; 8 *Johns.* 113; 10 *Mass.* 274; 11 *Mass.* 368 *to* 379; 1 *Bro. Ch.* 543; 5 *Ves.* 173; 10 *Ves.* 360; 11 *Ves.* 168, 535; 1 *Doug. Mich.* 401; 2 *Doug. Mich.* 155, 344.

But it is enough to defeat this suit, that the conveyance of 1838 was voluntary, and without valuable or meritorious consideration. Courts of equity will not interfere to *carry into effect*, or *correct*, or *improve the informalities* of such a transaction.— 2 *Story Eq. Juris.* §§ 786, 793 *a*; 1 *Cow.* 711, 773; 9 *Peters*, 204; 3 *Bro. Ch.* 12; 1 *Ves.* 50; 6 *Ves.* 662; 12 *Ves.* 37; 18 *Ves.* 149; 1 *Johns. Ch.* 329, 336; 4 *Johns. Ch.* 498.

It is settled, therefore, that if these complainants had notice, in law or in fact, that the conveyance of 1838 was *fraudulent* or voluntary, or that it was in any way defective, so that it would require the assistance of a court, they can have no relief.

2. These complainants had notice, as a matter of law, through the registry acts, that the title they were about to purchase was defective.

A party must use *reasonable diligence*, or equity will not relieve him.— 1 *Story Eq. Juris.* § 146.

Any thing which is calculated to put a party on inquiry is enough. — *Ibid.* § 400. There can certainly be no doubt but this rule extends to registered title deeds, through which title must be derived, and especially the deed of the immediate vendor. The registry of deeds is taken in the United States as full and complete *notice to all the world* of the condition, and all infirmities, of title.—15 *Johns.* 568; 15 *Wend.* 594, 595; 3 *Sandf. Ch.* 592; 6 *W. & S.* 469, 474; 10 *Ohio*, 405; 6 *B. Monr.* 67; *Adams' Eq.* 151 *to* 155, *and notes*; 1 *Mich.* 202, 205.   The same cases hold that a purchaser has notice of whatever appears in his title papers.

Certainly such a deed is notice as to the amount of land claimed by the vendor.—2 *Lead. Cas. in Eq. pt.* 1, *p.* 120, *and cases cited.*

The presumption of notice of the contents of a registered deed is so strong that equity will not allow it to be explained away or rebutted; and such deed overrules an express denial of such notice.

No attempt has been made to explain away or rebut such notice in these cases, but the attempt is made to ignore the rule itself, as clearly fatal to the relief prayed for by the complainants.   The rule, however, is too well established to be shaken.— *Rogers v. Jones*, 8 *N. H.* 264; *Farnsworth v. Childs*, 4 *Mass.* 637; *Sigourney v. Munn*, 7 *Conn.* 324; *Jackson v. Neely*, 10 *Johns.* 374; *Griffith v. Griffith*, 1 *Hoff. Ch.* 153; *Sterry v. Arden*, 1 *Johns. Ch.* 267; *Green v. Slayter*, 4 *Johns. Ch.* 38; *Bellas v. Lloyd*, 2 *Watts*, 401; *McAteer v. McMullen*, 2 *Barr*, 32; *Diehl v. Page*, 2 *Green Ch.* 143;   *Oliver v. Piatt*, 3 *How. U. S.* 333;   *Graves v. Graves*, 1 *A. K. Marsh.* 165; *Honore v. Blackwell*, 6 *B. Monr.* 67, 73; *Hackwith v. Damron*, 1 *T. B. Monr.* 235, 237; *Christmas v.*

*Mitchell*, 3 *Ired. Eq.* 535; *Nelson v. Allen*, 1 *Yerg.* 360; *Mason v. Payne, Walk. Ch.* 459.

The defective deed being therefore fraudulent and void, it passed no title to the lands to Alanson; and there being *none in him of record* (except to the fraction), when the complainants purchased, they acquired none. As a consequence, the complainants are seeking *to create* an original legal conveyance, not to *correct a legal one* which has been found defective. The registry showed no title in their vendor, and they had notice of that fact. It is, therefore, incumbent on them to establish a valid title in him, which they fail to do, and the case shows that none existed. The conclusion from these circumstances, both of law and fact, is irresistible, that the complainants are not *bona fide* purchasers, and are not entitled to relief.

3. Complainants are chargeable with notice *in fact*, that the real title was not in Alanson. They had knowledge of such facts as were calculated to put them on inquiry; which is sufficient.

MANNING J.:

I agree with the learned judge who decided the cases in the court below, that the deed from Aaron Thomas to his son Alanson, which complainants ask to have re-formed, was made to defraud the creditors of Aaron. The evidence is conclusive on that point; and admitting complainants are purchasers in good faith, for a valuable consideration, and without notice of the fraud, or of the mistake in the deed from Aaron to Alanson, their grantor; they still have failed to make a case entitling them to relief in a court of equity. On the ground of purchasers for a valuable consideration, without notice, they asked and obtained relief in the court below, where it seems to have been taken for granted that that, of itself, is an equity on which a bill may be sustained for relief. It can be used as a defense only. It is a shield to protect a party, but can not be made a basis of

attack. It was so held in *Beekman v. Frost*, 18 *Johns.* 544, on appeal from Chancellor Kent—the Court of Errors reversing the decree of the Chancellor. In that case, as in the cases before us, the question was not raised in the court below. Spencer Ch. J. in delivering the opinion of the court, says: "In *Patterson v. Slaughter*, *Amb.* 293, Lord Hardwicke laid down the rule to be, that the title of a purchaser for a valuable consideration is not ground for relief, though it is a good defense." The Chief Justice then says: "No book of precedents, no treatise on equity, furnishes a case of a bill filed on the ground that there has been purchase without notice, and for valuable consideration." The principle is also recognized in *Jackson v. Cadwell*, 1 *Cow.* 622. Hare & Wallace, in their notes on *Leading Cases in Equity*, vol. 2, pt. 1, p. 55, say: "There can be no doubt that a defense resting on the ground of a purchase for valuable consideration, as technically made by plea, which does not allege the existence of a good title in the vendor, and which, as remarked by Lord Eldon, implies a want of title in the vendee, can not, in itself, furnish a ground for a suit or action, either in a court of equity or of law. Such a defense shows matter sufficient to exonerate the conscience of the purchaser, and entitle him to retain what he has purchased, but does not, necessarily or usually, show enough to bind the conscience of others, and become the foundation of equitable proceedings against them."

The reason of the rule has been said to be, that the party to be affected by it is entitled to the oath of the party seeking to avail himself of it. I do not think this the true reason; for a defendant may obtain the oath of complainant on a bill of discovery. The rule rests on a more solid foundation; which is, that the effect the law gives to a purchase without notice, is not a perfect right in itself, and, therefore, will not sustain an action at law or bill in equity, but may, in certain circumstances, be used by a defendant to stay the interposition of the court, on the ground that he is equally entitled with the plain-

tiff to its protection. If the right was in itself a perfect right — one that would sustain an action at law or bill in equity — no man's property would be safe. B having a horse belonging to A in his possession, sells it to C, who purchases in good faith, believing it to be the property of B, and pays him what the horse is worth. A sues C in trover for the horse. C is a bona fide purchaser for a valuable consideration, without notice, and has all the rights of such a purchaser; and yet it is no defense. But if A, instead of having a legal right to the horse, had an equitable right only that was good against B's legal right, and to enforce it was under the necessity of going into a court of equity, the court would give him relief against B, and also against C, if he purchased of B with a knowledge of A's equitable title; but it would not give him relief against C if he had purchased of B without notice of A's equity. Why would the court give relief against C in the one case and not in the other? Because, in the first case, C would have the legal title without any equity—he would have B's title, and nothing more — and A's equity would prevail against his legal title. In the other case, C would have the equity of a bona fide purchaser in conjunction with the legal title, and for that reason the court would refuse to divest him of his legal title in favor of A's equity. Or, in other words, it would leave complainant his legal remedy. This is what I understand by the equity of a bona fide purchaser without notice.

When defendant has the legal title, and plaintiff is seeking to divest him of it by reason of some equity that was a good ground for relief against his grantor, he may turn on his adversary, and say: "I purchased the estate you claim of me in good faith; I paid a valuable consideration for it, and I had no notice of your claim when I parted with my money."

In the cases before us, complainants admit Alanson Thomas, their grantor, had no legal title when he conveyed to

them, and they file their several bills to re-form the deed from Aaron to Alanson, so as to vest the legal title in him, and, through him, in themselves respectively, to the part of the premises severally purchased by them of Alanson. They stand in the precise position mentioned by Hare & Wallace in the note to which I have referred, of " purchasers for valuable consideration as technically made by plea, which does not allege the existence of a good title in the vendor " (Alanson Thomas, their grantor), " and which, as remarked by Lord Eldon, implies a want of title in the vendee." In the present cases, the want of title in complainants is admitted, not implied; and they come into a court of equity to get a title.

As no relief can be given solely on the ground that complainants purchased in good faith without notice, is there any other ground on which the relief asked may be granted? As purchasers from Alanson Thomas, they have all of his right at law and in equity, and nothing more. But this court would not correct the mistake in favor of Alanson, on a bill filed by him, for he was a party to the intended fraud of the father. Neither can it in favor of complainants, his grantees, without conceding to them greater rights than Alanson had, and making itself a party to the intended fraud. It matters not there are no creditors, even if such be the case, now to be injured. It is the corrupt intention, the illegal object the Thomases had in view — the wrong intended, and not the wrong done — that stays the hands of the court. If the court would not have corrected the mistake the instant it occurred, it will not now; for, by correcting it now, it would give effect to the deed from its execution. To give effect to it on any day subsequent to the time the parties intended it should take effect, would not be enforcing the original contract, but making a new contract for the parties.

A court of equity will not decree a specific performance of an illegal contract. On what principle, then, can it correct a mistake in such a contract?

QUIRK *v.* THOMAS.

There is another ground, it seems to me, aside from the intended fraud, why the relief asked should not be granted. It is the want of a consideration for the deed from Aaron to Alanson. The deed was intended to be the execution of a voluntary contract. And as a court of equity will not decree the performance of such a contract (*Colman v. Sarrell*, 1 *Ves.* 50; *Antrobus v. Smith*, 12 *Ves.* 39; *Edwards v. Jones*, 1 *Myl. & Cr.* 226; *Ellison v. Ellison*, 6 *Ves.* 656; 2 *Spence Eq. Juris.* 285, notes *b* and *c*), I can not well conceive of a case, where there is no intervening equity, in which it would correct a mistake in a defective execution of it. The most complainants can claim, even in a court of equity, under their deeds from Alanson, is, that they are in equity the assignees of such contract. And, as assignees, they would take it subject to all its vices, and to all equities existing between the parties to it.

Complainants are not bona fide purchasers without notice. In law, they could not be said to be ignorant of the mistake when they purchased. The deed from Aaron to Alanson was recorded, and they are chargeable with notice of every thing that appears on the face of the record. If they purchased without examining the record, or seeing whether it described the land they were about to purchase, it is their misfortune, and, unhappily for them, one that this court can not correct. If it be said the registry is notice only to subsequent purchasers from the same grantor, there is still another principle of law which charges them with notice. It is, that a vendee is deemed to have notice of what appears on the face of a conveyance through which he claims title, whether it be in a conveyance to his grantor, or other prior conveyance in the chain of his title.

Aaron Thomas, in his lifetime, frequently said he had conveyed the farm to his son, and made the same statement under oath in a court of justice. Such declarations were evidence to prove the mistake in the deed from him to Alanson, but not to disprove the fraud with which the

deed was tainted. They were consistent with the fraud, and were doubtless made with intent to conceal it. Nor can it be said they liken complainant's case to a purchase of a third person, in the presence of the real owner, under an impression such person was the owner, and the cotemporaneous declaration of the owner to the same effect. For it does not appear the declarations of Aaron Thomas, referred to, were ever made to, or in the presence of, complainants, or either of them. Aaron Thomas was not present, nor could such declarations have been made by him, when complainants purchased. He died in 1847; and it was on the 14th of February, 1848, Alanson deeded to Quirk, and on the 9th of September, 1850, he deeded to Greusel. I am therefore unable to see any equity in favor of complainants growing out of the declarations of Aaron Thomas. If there be any, in what does it consist, and where is it to be found? Certainly not in what Aaron Thomas said or did in the presence of complainants, but in what they may have understood from others he had said and done. This is public rumor — nothing more; and if public rumor can create an equity on one side, I know no reason why it may not on the other. Complainants forget, while calling in public rumor to assist them, that her testimony, like a two-edged sword, cuts both ways — that while she testifies in favor of a conveyance, she at the same time states it was made to defraud creditors. On what principle can one part of her story be received, and the other rejected? The truth is, there is no equity growing out of the declarations of Aaron Thomas, one way or the other, and I can not see that they have any thing to do with the case, except for the purpose I have already stated.

The Statute of Frauds, it is said, declares the deed void as against creditors only, leaving it good between the parties to it. The statute, in this particular, is declaratory of the common law only, by which all contracts made in violation of law, or contrary to public policy, are

illegal, and consequently void; and when executory, will not be enforced, or relieved against when executed — the law treating the whole transaction as void and of no effect, in the former case, and giving full force and effect to it between the parties in the latter — when it has been executed in part, giving it effect so far as it has been executed, and holding it void so far as it remains executory. —*Nellis v. Clark*, 20 *Wend.* 24, and 4 *Hill*, 424. In that case the Statute of Frauds, the common law, and the validity and effect of such contracts, were fully considered, and all the cases bearing on them referred to and commented on by Cowen J., in the Supreme Court, and by Chancellor Walworth, in the Court of Errors. Cowen, J., in delivering the opinion of the Supreme Court, says: "It" (the statute) "declares all contracts, both executory and executed, to defraud creditors, *void only as against the latter*. It was wanted for nothing else. It was but declaratory; and were it not for the fourth section, giving additional sanctions, the common law would have reached every purpose. Now, had the statute stopped with declaring the contract simply void, it would have changed the common law, avoiding one class, viz., executed contracts, which that law would not interfere with. Therefore, the statute withdraws itself entirely from any interference between the parties, with the intent to let the common law take its own course." Chancellor Walworth, in his opinion, says: "A sale or assignment for the purpose of delaying, hindering, or defrauding a creditor in the collection of his debt, was illegal at the common law, and is, in itself, immoral, and against public policy. And the statutes declaring such transactions void as against creditors, are only in affirmance of the common law on that subject. The word *only*, as used in the statute of Elizabeth, and in our revised statute of 1787, on this subject, was not intended to render executory contracts of that character legal and valid between the parties thereto. But it was inserted to prevent the

general provisions of the statute from changing the common law rule, as between the parties themselves, in relation to executed contracts."

The decrees of the court below, I think, should be reversed, and the bills be dismissed.

CAMPBELL J.:

As I concur entirely in the views expressed by my brother Manning in these causes, I do not propose to enter into any extended argument on the legal questions involved.

It is very manifest that Alanson Thomas had no title to any land not covered by his deed. If he had any rights outside of the land there described, they arose not from the deed, but from circumstances which entitle him to relief independent of it—or, in other words, from the equity to have a new deed conforming to some right which was not perfectly assured by the deed as drawn and executed.

The complainants undertook to purchase from Alanson, and they, in like manner, could only obtain a *legal* title to what was covered by the deed under which he claimed. They took a conveyance from him of lands not embraced in that deed, and, so far as depends on any right obtained merely from him, that conveyance would be operative to pass no more than he possessed, which would be the legal estate in the lands he owned, and any claim he might have to the lands he did not legally own.

It certainly requires no great amount of reasoning to show that Alanson Thomas had no rights which would be enforced by any court of law or equity. The ground of relief against mistakes is placed upon the same basis with that for specific performance, and the mistake is corrected by establishing the original right to a conveyance, or other instrument, under some agreement which, by reason of the mistake, has not been fully carried out. To make out the mistake, it is necessary to make out the contract, in order that the court may see how far it has failed in the per-

QUIRK v. THOMAS.

formance. In this case, not only is the deed shown to have been made for the express purpose of defrauding creditors, but there is not the slightest evidence of any previous bargain, or even conversation, between Aaron and Alanson Thomas, on the subject of making such a deed at all. Nor have we any evidence whatever of when it was delivered, or what took place on the delivery. While the case shows thus clearly the fraudulent character of the transaction, and while it shows as clearly that no consideration passed, or existed even, for the imperfect deed, there is an entire absence of testimony from which we may gather any of the facts attending the iniquitous arrangement. All of the testimony on the subject is of subsequent acts and declarations, made with the plain design of blinding creditors, and from which it is as easy to infer that the description was made intentionally erroneous, in order to deceive creditors, as that Aaron Thomas designed putting himself entirely in his son's power, and leaving no provision for his other heirs. But were the actual understanding, and a mistake, plainly proven, it would not avail any more to entitle Alanson to relief. He would not have the shadow of an equity.

The equities upon which the complainants rely, are not Alanson's equities, but entirely outside matters. They depend really upon acts said to have been done by Aaron Thomas, which, it is claimed, should operate as equitable estoppels upon him and his heirs. And here, I think, a little confusion has arisen in assuming that the case stands as it would have stood had he lived. Whatever rights exist against an ancestor, will undoubtedly, as a general rule, exist against his heir. But here, Aaron died before either of the complainants acquired any rights. He never made any representations to them whatever. And I have been unable to find any rule of law which authorizes a person to hold another liable for acts or representations not made to himself, or to some one under whom he derives

title, who has innocently acted on, and been deceived by, them. The complainants had no rights against Aaron Thomas by reason of any such representations or acts, and their grantor had none. They can, therefore, in my opinion, have none against his heirs.

CHRISTIANCY J.:

After a most careful consideration of these cases, I am unable to agree in the opinion which has been given by my brothers Manning and Campbell.

I think we are all substantially agreed upon the following facts,— at all events, I think they are sufficiently established by the evidence:

*First*, That the deed from Aaron Thomas to Alanson Thomas was fraudulent as to creditors:

*Second*, That there is no sufficient evidence that complainants had any actual notice of the fraud at the time of their respective purchases:

*Third*, That complainants are purchasers for a valuable consideration:

*Fourth*, That there was a mistake in the deed from Aaron to Alanson Thomas — both parties understanding and treating it, during their respective lives, as a deed of the whole farm, including the lands claimed by complainants — and that they both died in ignorance of the mistake; that from the date of the deed in 1838 till the death of Aaron in 1847, both he and Alanson Thomas represented the latter to be the owner of the farm under said deed; that though both remained in possession, Aaron, for the greater portion of the time, had actual possession of but a small part, where he resided, and the business was carried on chiefly, if not entirely, in the name of Alanson, to whom Aaron directed persons wishing to transact business in respect to the farm or farm produce, and persons wishing to lease or purchase any parts of the farm, as well as those who applied to assess or collect taxes thereon, declaring to such persons that the

farm belonged to Alanson; that Alanson leased out portions of the farm in his own name, with the full knowledge of Aaron, and without objection from him; that Aaron, in fact, took especial pains to induce the public to understand and believe that Alanson was the owner; that he twice directly testified, in a court of justice, that the farm belonged to Alanson,—once in his affidavit in the suit with Hurd, in February, 1846, and once in his answer to a bill in chancery by Warren, in January, 1845; and that, in this suit, Aaron disclaims all title, saying (under oath) that he had conveyed to Alanson, and that the latter had been in possession from the date of the deed; that in 1839, in an action of trespass before Dort, justice, he disclaimed any interest in the lands leased by Alanson to Lawrence and Sherman, respectively, which he testified had been so leased by Alanson to them:

*Fifth*, That complainants had no notice of the mistake in the deed at the time of their respective purchases from Alanson, in 1848 and 1850, except such constructive notice as is by law to be implied from what appeared on the face of the deed and record, by reason of their claiming through the deed in question:

*Sixth*, That Mr. Backus, who was the counsel and professional adviser of both Aaron and Alanson, from 1838 or 1839, till the time of their deaths, frequently had both the patent and the deed in question in his possession, and never discovered or knew of the mistake,—both parties always speaking of the farm as Alanson's, and never having intimated to him that the deed had been made to defraud creditors; that both complainants, before purchasing from Alanson Thomas, applied to, and inquired of, him, whether they could get a good title; that he informed them a conveyance from Alanson would be good, and that he so believed:

*Seventh*, That Alanson continued in the open and peaceable possession of the land in question after the death of

6 MICH.—H.

Aaron, and up to, and at the time of, the respective conveyances to complainants:

*Eighth*, That the mistake in the description was first discovered by Titus Dort, administrator of Alanson, after the death of the latter, and some time after the respective conveyances to the complainants—the latter being then in possession, improving and using the land as their own.

If the creditors of Aaron Thomas, or subsequent bona fide purchasers from him, were to be affected by the correction asked by the bills, and such creditors or purchasers were opposing the relief, a very different question would be presented, and, in such case, perhaps no relief could be given.   But the relief is asked only against the heirs of Alanson Thomas and the administrator on his estate, and is opposed only by them.   Heirs have none of the equitable rights of purchasers who have paid their money for the land, but, upon principle and authority, stand precisely in the condition of their ancestor—having no greater rights—and can avail themselves of no defense which would not have been equally available to him (*Jackson v. Garnsey*, 16 *Johns.* 191); and there being no legal evidence in the case of any debts against the estate—nothing from which debts to any definite amount could be inferred, if any mere inference were permissible, nor any thing to show that the administrator is seeking the property at the instance of creditors—the administrator stands in no better position than the heirs.—*Osborne v. Moss*, 7 *Johns.* 163.   Both the above were cases of fraudulent conveyances by deceased, in one of which the heir, and in the other the administrator, sought to set up the fraud in defense; but in both it was held incompetent.

I shall therefore consider the cases before us as if these bills had been brought against Aaron Thomas himself.   And looking at the facts of the case in the light of plain common sense, and applying those principles of honesty and fair dealing universally recognized as governing the ordinary business transac-

tions of men, the case would certainly seem to present a very strong and clear equitable right in the complainants as against Aaron Thomas, and, upon every principle of justice, to entitle them to a correction of the mistake. And if a court of equity can not grant relief in such a case, it must be deplorably infirm in the administration of remedial justice. Just reasoning should lead to just results; and any course of reasoning which leads to a result opposed to the just rights of the parties, should, at least, be carefully scrutinized before it is admitted as established law.

I propose to examine the objections urged to the relief in these cases, and to show, also, the ground upon which I think it should be granted.

One principal ground upon which my brethren feel bound to deny relief is, that the contract or transaction between Aaron Thomas and his son, Alanson, was fraudulent as to creditors, and therefore illegal between the parties at common law, as opposed to public policy; and that courts will not enforce an illegal contract.

Whether the contract, as between the immediate parties, was illegal in that sense which would prevent Alanson Thomas from sustaining an action upon it against Aaron Thomas, is by no means well settled by the cases; for, though we admit that the statute 13th Elizabeth, and our own statute in reference to fraudulent conveyances, are only in affirmance of the common law; it does not follow that the common law went further than the statute, and made such contracts, even when executory, void or illegal as between the parties, so as to enable one of the parties to set up his own fraud in his own defense. It is true it was so held in *Smith v. Hubbs*, 1 *Fairf.* 71; in *Norris v. Norris' adm'rs*, 9 *Dana*, 317, and by Cowen and Bronson, judges, against the opinion of Nelson, chief justice, in *Clark v. Nellis*, 20 *Wend.* 24; and this decision was sustained in the Court of Errors (4 *Hill*, 424), by a vote of ten to nine—the Chancellor, who voted for reversal, concurring with the Supreme

Court in their view of the law, but thinking it inapplicable to that case. While, on the other hand, directly the opposite view of this question has been held by the Supreme Court of Indiana, in *Findley v. Cooley*, 1 *Blackf.* 262, and the Supreme Court of Massachusetts in *Fairbanks v. Blackington*, 9 *Pick.* 93, and, as I think (notwithstanding the criticisms to the contrary), by the Court of King's Bench, in *Hawes v. Leader*, *Cro. Jac.* 271. And in the last case, and all the following cases, among many others, the contract has been expressly declared to be good between the parties, and void only as to creditors, without any reference by the court to any distinction between the case of an executed and executory contract.—*Jackson v. Garnsey*, 16 *Johns.* 191; *Drinkwater v. Drinkwater's adm'r*, 4 *Mass.* 354; *Cushwa v. Cushwa's lessee*, 5 *Md.* 45; *Broughton v. Broughton*, 4 *Rich.* (*S. C.*) 492.

It is true those who claim such contracts to be illegal as between the parties, undertake to base these decisions on the ground that the contracts in question were executed, and not executory. But while this distinction is well founded in principle, when applied to cases where the contract has been fully *performed*, so as to place the party claiming under it, without the aid of the court, in full possession of the thing illegally contracted for, yet, when applied to the class of cases last cited, where, though the contract is completed, the party has obtained nothing by it, and never can obtain any thing without the aid of the court, the distinction alluded to becomes merely verbal and technical, without any foundation in principle. The rule which forbids the maintenance of a suit upon an illegal contract while executory, is based upon the ground of public policy; that courts, to discourage fraud, should refuse all aid to parties seeking to derive advantage from their own illegal acts; yet, without the aid of the court, the personal property in *Hawes v. Leader*, the land in *Jackson v. Garnsey*, the only substantial benefit, the illegal end and object of the contracts, could

never have been attained, and the contracts would have been mere waste paper. If, therefore, the contracts were illegal, the court in these, and all other cases of this class, directly aided the guilty party in violating the law of the land; and the merely verbal distinction between executed and executory contracts can not alter the fact. I am well satisfied, therefore, from these considerations, as well as from the fact that the courts expressly declared the contracts to be valid between the parties, and placed the decisions on the broad ground that a defendant shall not set up his own fraud in defense, that the courts did not consider them illegal contracts in any sense; and that subsequent judges, in carrying out a favorite theory of their own, have given reasons for these decisions never thought of by the courts who made them, and by no means flattering to their good sense. In every substantial sense, within the principle of the rule which refuses to carry into effect illegal contracts, all the deeds and contracts referred to in this class of cases remained executory. To hold otherwise would be to hold that parties to an illegal contract might, by formal ceremonies always in their power, by the necromancy of ink and paper, or by the enchantment growing out of the delivery of a pewter dish (as in *Hawes v. Leader*), get entire control of the courts, and compel them to aid in giving effect to illegal transactions.

But suppose it be admitted that the contract, as between Aaron and Alanson Thomas, was illegal, so that the latter could maintain no action upon it: it can not prejudice the complainants here. It is true that where a statute declares a contract absolutely illegal and void, to all intents and purposes, as has sometimes been done in reference to notes and contracts given for a usurious or gambling consideration, they have been held void in the hands of a bona fide holder. But contracts are treated as void at common law on the ground of public policy only; and the rule, *ex turpi causa non oritur actio*, is subject to all the limitations and

qualifications which sound public policy may dictate; and courts will sustain, or refuse to sustain, an action upon such contracts, as may be most consistent with sound policy, and best calculated to discourage and suppress such violations of the law.—*Story Eq. Juris.* §§ 298 *to* 300, *and cases there cited; Starke's ex'rs v. Littlepage,* 4 *Rand.* 368, *per Green J.; Cushwa v. Cushwa's lessee,* 5 *Md.* 52 *and* 53; *Sedgwick v. Sedgwick,* 6 *Gill,* 29.

One qualification of the rule is, that the rule itself shall not be made an engine of wrong and injustice, in the hands of the wrong-doer against innocent parties. It can never be good policy to punish the innocent for the crimes of the guilty. Hence, the rule can not be set up to the prejudice of any party innocent of all participation in the wrong, or whose rights have been acquired without notice of it. I am not aware of any case, at law or in equity, where a contrary doctrine has been held, unless the illegality or fraud occurred directly in the course of judicial administration; and if there be any such, I can not esteem it as good law or good sense. In some of the cases, general language has been used, which, abstractly considered, might be supposed to extend the rule to innocent parties; but when considered with reference to the cases before the courts, it will be found to apply only to the parties in fault. The rule is laid down, with its proper limitations, by Lord Brougham, in *Armstrong v. Armstrong,* 3 *Myl. & K.* 64; and see *Fivaz v. Nicholas,* 2 *M., G. & S.* 512 *to* 514; and Cowen J. admits this in *Clark v. Nellis,* 20 *Wend.*; and the Chancellor in the same case (4 *Hill*). The rule in question is the same which declares that a party "must come into court with clean hands"—"that no polluted hand shall touch the pure fountain of justice"—that the court will not aid a party seeking the reward of his iniquity. And in *Holman v. Johnson, Cowp.* 343, a leading case on the subject, Lord Mansfield says, in speaking of the ground on which the defense of illegality is allowed, "It is not for the sake of the defend-

ant, but because they will not lend their aid *to such a plaintiff."*

And, as against an innocent party, "no man shall set up his own iniquity as a defense, any more than as a cause of action"; per Lord Mansfield in *Montefiori v. Montefiori,* 1 *W. Bl.* 363; see also per Abbott Ch. J. 2 *B. & Ald.* 368; and see argument 4 *Bing.* 639; and in *Doe v. Roberts,* 2 *B. & Ald.* it was held that a party could not set up his own fraud in defense against his own deed, though the fraud amounted to illegality, and the plaintiff was a party to it.—See *Cushwa v. Cushwa's lessee,* 5 *Md.* 45, 54; *Broughton v. Broughton,* 4 *Rich.* 492.

Not only is it incompetent to set up such a defense against an innocent party, but the law will discriminate as to the degrees of guilt, as between the immediate parties; and it is well settled, both at law and in equity, that to enable a party to a transaction merely illegal as against public policy, to show his own fraud in his own defense, the plaintiff must not only be *in delicto* but *in pari delicto.* And it is in this class of cases that the rule *in pari delicto* especially applies; and though the plaintiff may, to some extent, have participated in the illegal transaction, yet, if not equally guilty with the defendant (or at least if there be strong mitigating circumstances in his favor) the latter will not be allowed to avail himself of the defense. — *Skaife v. Jackson,* 3 *B. & C.* 421; *Smith v. Cuff,* 6 *M. & S.* 160; *Alsager v. Spalding,* 4 *Bing. N. S.* 407; *Horton v. Riley,* 11 *M. & W.* 492; *Turner v. Hoole, Dow. & Ry. N. P. C.* 27; *Smith v. Bromley, Doug.* 696; *Osborne v. Williams,* 18 *Ves.* 379; *Whaley v. Norton,* 1 *Vern.* 483; *Bainham v. Manning,* 2 *Vern.* 242; *Anandale v. Harris,* 2 *P. Wms.* 432; *James v. Bird's adm'r* 8 *Leigh,* 510 (referring to case of *Austin v. Winston,* 1 *Hen. & M.* 33); *Story Eq. Juris.* § 300; *Adams v. Barrett,* 5 *Ga.* 404.

To apply these well settled rules to the cases before us — are the complainants *in pari delicto* with Aaron Thomas in this fraud? In what violation of law have they participa-

ted? What stain is discoverable upon their hands, more than upon the hands of this court? I can see none, and my brethren do not claim to have discovered any. To apply the rule *ex turpi causa* to these complainants, or to allow them in any way to be prejudiced by the iniquity of Aaron Thomas, and especially to allow him to set up his own iniquity against these complainants, who are innocent of all participation in it, would, it seems to me, be ·extending the rule far beyond the policy which dictates, and should always control, it — converting a broad principle of public policy into an arbitrary technicality, blind alike both to policy and justice; confounding all ideas of right and wrong, and punishing the innocent for the faults of the guilty — thus making the letter of the rule defeat its spirit and its object, and the rule itself an efficient engine for the perpetration of the fraud and injustice it was intended to prevent.

There is nothing arbitrary or technical in the rule in question in a court of law; and I am not willing to close my eyes to the just rights of parties, for the sake of erecting a new, arbitrary barrier to those rights in a court of equity.

The law, I think, need not fear defilement from coming in contact with fraud, for the purpose of suppressing it, or protecting the innocent. I can not resist the conclusion, that it will tend much more to the suppression of fraudulent contracts of this kind, and is therefore more in accordance with sound public policy, to enforce them against the fraudulent party himself, than to allow him, not only to escape the evil consequences, but actually to reap an advantage from his own fraud as against innocent parties. No one, in such case, can suffer any detriment from the enforcement of the contract but the guilty party himself, and he has no right to complain: as he sought the advantage, let him bear the burden of his iniquity.

I think, therefore, this defense is wholly incompetent for these defendants, as against these complainants; that the court have no right to listen to it as against the latter, and

that the case is to be considered in all respects as if there had been no fraud, and the contract between the Thomases had been in good faith and for a good consideration.

As to the objection of a want of consideration between Aaron Thomas and his son, I am at a loss to perceive how that can be raised by Aaron Thomas, any more than the fraud; or how he can raise it at all. The transaction was single and entire, and for the purpose of defrauding creditors. It was without consideration, simply because it was fraudulent; and Aaron Thomas is not entitled to have this single transaction divided up into two parts, one fraudulent and the other innocent, so as to allow him to claim the protection due to an innocent voluntary vendor: besides, he has said to all the world by his deed, and to these complainants in particular, who have bought upon the strength of it, that he had received the consideration of "five thousand dollars, good and lawful money of the United States"; and as they had no notice to the contrary, and bought in good faith (beyond all question as to this point), he would be estopped to deny the consideration as against complainants, had there been no fraud, and the conveyance had been merely voluntary. In *Frazer v. Western*, 1 *Barb. Ch.* 220, it was decided that even where a purchaser has notice that the deed to his grantor was voluntary and without consideration, this does not make it his duty to inquire, at his peril, whether it was fraudulent as to creditors; and that the legal presumption is that such conveyance is valid where a relationship of blood or marriage exists between the parties; and see *Wyche v. Greene*, 11 *Ga.* 159, where a mistake was corrected in a voluntary conveyance.

But it is further objected that, as to so much of the land as is not actually included in the deed of Aaron to Alanson, owing to the mistake, the transaction must be put upon the ground of a contract to convey; that this is a mere chose in action, and complainants, being merely assignees, can stand in no better position than Alanson Thomas himself. No proof

of any actual previous agreement in such case need be given; but what was the understanding of the parties, and what was intended to be conveyed, may be inferred entirely from the deed itself, the subject-matter, the surrounding circumstances, and especially the subsequent acts of the parties. — *Story Eq. Juris.* §162; *Farley v. Bryant*, 32 *Me.* 474; *Wyche v. Greene*, 11 *Ga.* 159; and see *Showman v. Miller*, 6 *Md.* 479, where the agreement was inferred wholly from the deed and the surrounding circumstances, against direct evidence of a different agreement, and the mistake corrected.

That, as a general rule, an assignee of a chose in action takes it subject to all equities existing between the original parties, cannot be doubted. But if this rule were applicable to such cases as the present, as I think it is not, it may well be doubted whether the fraud of Aaron Thomas can constitute an equity in his own favor, as against complainants, who have not participated in the fraud; especially as such a defense is never allowed to a defendant on his own account. But it is said a purchaser of a chose in action must be presumed to have notice of what the rights of the parties to it really were. This is doubtless true, as a general rule (so far, at least, as respects any defense allowed on the defendant's own account), and when the vendor *understands* that he is selling, and the purchaser that he is buying, a chose in action; because, in such case, every purchaser knows he is getting nothing except the right of action existing between the original parties; and hence it becomes his duty to inquire into those rights, and it is his own folly if he does not. But where, as in this case, both the vendor (Alanson Thomas) and the vendees (complainants), understood that the one was selling, and the others that they were purchasing, the *land* itself, *instead* of a mere *contract* respecting it; and especially where such was the understanding of the original transaction by the parties to it, and by all parties throughout, and the purchasers have paid their money for the land itself, and only failed to obtain the title in consequence of

a mistake in the deed of the first grantor, alike unknown to all the parties—in such a case, it seems to me, the reason of the rule in question substantially fails; and that, to hold the parties to the ordinary rule applicable to a chose in action, would be to bind them by a contract which none of the parties ever assented to, or intended to make. *Non videntur qui errant consentire;* and the rights and obligations of the parties should be put upon the basis of the contract they intended to make, and believed they had made,—the basis of a conveyance of the land itself.

And the rights of the complainants should be governed, as to notice of every thing affecting the rights of prior parties, by the same rules which apply to conveyances of land. As such bona fide purchasers, the rules applicable to a chose in action are no way applicable to them (see *Leading Cases in Eq. vol* 2, *pt.* 1, *pp.* 51 *and* 52); and they stand upon grounds equally as strong as those which protect the bona fide holder of negotiable paper; and are no more bound to inquire into the consideration or the secret motives of the parties to any of the prior conveyances, especially where their immediate grantor is in open and peaceable possession, and no want of consideration, and no illegality or unfairness, appears on the conveyance.

A bona fide purchaser is a peculiar favorite of courts of equity, and those courts have gone, perhaps, further in protecting such purchase than in protecting any other right cognizable in equity.—See *Leading Cases in Eq. ed. above cited, pp.* 37 *and* 48; *Sugden V. and P.* 11*th ed.* 924 *to* 1013. And though the statute expressly declare a fraudulent conveyance *void as against creditors*, and make no exception in favor of bona fide purchasers, yet such purchasers will hold even against *creditors.* — *Anderson v. Roberts,* 18 *Johns.* 516; *Jackson, v. Terry,* 13 *Johns.* 471; *Boyce v. Waller,* 2 *B. Monr.* 91; *Frazer v. Western,* 1 *Barb. Ch. R.* 220; *Lee v. Abbe,* 2 *Root,* 359 (and such is the rule expressly enacted by our own statute, *Comp. L. vol.*

2, *p.* 948, § 3202, in force when the conveyances to complainants were made). But if a statute declare negotiable paper absolutely void, it is void in the hands of a bona fide holder.

But it is objected that complainants can not claim to be bona fide purchasers, because the deed was recorded, and they were bound to take notice of any defect of title appearing on the record. I am at a loss to perceive how the record of the deed can have any bearing upon this question. The purpose of the registry law, as I understand it, is not to give notice, as between a grantor and his grantee, immediate or remote, for the protection of the grantor, but as between prior and subsequent purchasers and incumbrancers from the same grantor, and for the protection of purchasers. As between Aaron and Alanson Thomas, or as between the former and the grantees of the latter, the question would be precisely the same if the deed had never been recorded.

I admit the general rule, that a purchaser is bound to notice such defects of title, and such incumbrances, as appear on the face of any deed through which he derives title, whether it appear directly or by reference to some other paper mentioned in it. This was the rule at common law, and does not depend upon the registry. But it will not, I presume, be contended, that under this rule, the deed itself could give the complainants notice of the fraud or illegality, as this does not appear on the deed, expressly or by reference; much less that complainants could thereby be made *particeps criminis* in the original illegality. Constructive notice, implied by this rule, is purely a fiction of law, adopted for wise purposes, and wholesome in its operation when confined within its proper limits: but *in fictione juris, semper equitas existit;* and to extend it so far as to make an innocent man *particeps criminis* in a past transaction of which he is actually ignorant, would make it an engine of oppression.

But it is contended, that under this rule, the deed of Aaron is notice to complainants of the mistake in the deed itself;

and that, therefore, they are not bona fide purchasers,.in respect to this mistake. I frankly admit I was at first deceived by the plausibility of this position, but further reflection, and a most careful investigation, have satisfied me that I was in error, and that the position is unsound; that the deed can not, as between these parties, be held to be notice of a mistake like this, without leading to gross absurdity. If the .question had arisen between these complainants and subsequent purchasers from Aaron Thomas, the rule contended for might apply. But this point, being in no way dependent upon, or affected by, the fraud, can be no stronger against complainants than it would have been against Alanson Thomas, had he purchased of Aaron Thomas in perfect good faith, and the same mistake had occurred. If the deed itself was notice of this mistake to complainants, then, much more, or, at least, equally, was it notice to Alanson Thomas, who took the deed, kept it in his own possession, got it recorded, and held under it till the day of his death (twelve years after) without any suspicion of the mistake. I can see no ground for holding, in such a case, that the second purchaser is bound to notice such a mistake in the deed, more than the first, who takes it directly and holds under it. And the result will be, if the deed itself is held to be conclusive evidence of notice of the mistake in the deed, and the purchaser taking under it is to be held to have taken it with knowledge of the mistake, then the very fact that such a mistake has occurred in the deed, will be a bar to its correction; and the whole jurisdiction of chancery, on this subject, is at an end. I can not, therefore, admit that a mistake of this kind, when the question arises, as in this case, without intervening equities, is one of those defects of title of which a purchaser is bound, at his peril, to take notice. It is simply and purely a mistake; and a subsequent purchaser can no .more be bound to notice it, or, as between these parties, to suffer from its non-discovery, than the party to whom it is directly made and delivered. Gross negligence

might possibly be a bar to such correction in either case. But the mistake in this case was eminently calculated to mislead. In the description, as contained in the patent, there are fourteen courses (and as many distances). The mistake in the deed consists in omitting four of these courses and distances. This is precisely the kind of mistake which would be most likely to be overlooked by any one but a surveyor; few men, not familiar with surveying, would be able to carry these various courses and distances in the mind through the entire description, so as to discover any discrepancy between the description and the shape of the tract upon the ground. The quantity mentioned in the deed agrees, to a fraction, with that mentioned in the patent,—437 6-100ths acres. The mistake therefore could only be discovered, by ordinary men, by a careful comparison with the patent; and it is not too much to say that a large majority of business men, and even those who are in the habit of examining titles, would be liable to be deceived by the mistake. And it can hardly lie in the mouth of Aaron Thomas to allege gross carelessness in these complainants, in not discovering it, when he himself, who caused it to be prepared, and executed it, lived and died in ignorance of the mistake, and twice, at least, testified to facts which must have been willful perjury, if he was aware of the error.

But there are also other reasons why Aaron Thomas can not insist upon holding these complainants bound by this mistake, and why he should not be at liberty to object to them the want of consideration, or his own intended fraud upon creditors. His own acts tended to lead them into the error, and to disarm them of any suspicion of fraud. I do not allude to any merely verbal statements of Aaron Thomas made to persons not shown to have communicated with complainants, and who did not, under the influence and belief of such statements, in any way advise or mislead the complainants in respect to the title. Nor are complainants to be affected by rumors and neighborhood reports or surmises.

If, without proof, they are presumed to have known these, then equally must they be presumed to have known the testimony of Aaron on the public records of the courts. But I refer especially to the matters stated in the four following points as tending directly to mislead complainants:

1st. The description in the deed, as I have shown, was in its nature calculated to deceive, and did deceive them, as it had deceived him, as well as Alanson and the widow and heirs. And if the error in the deed was intentional on his part, to defraud creditors, and to induce the belief that the whole had been conveyed, when he knew the contrary, the case is still the worse for him and his heirs; as it not only admits that the error was such as he supposed likely to deceive, but that he actually intended it should deceive. He must be presumed to have intended the natural consequences of his acts. The trap, though set for creditors, was so set and baited as to be equally dangerous to purchasers; and when the latter have been caught, shall he come into court and seek to avoid the consequences of his acts, on the ground that he only intended to entrap creditors? When courts become more solicitous for the protection of the avowed swindler (as this suggestion would make him) than of his innocent victim, it will be time enough to listen to the plea. But this suggestion is wholly inadmissible, as it is against his own oath, twice repeated, and there is nothing in the case to warrant it.

2d. He represents on the face of the deed that he had received five thousand dollars in cash, in payment for the land; and no man can believe that, but for this deed, complainants would ever have purchased the lands from Alanson Thomas.

3d. The fact that he put Alanson in possession, with all the apparent *indicia* of ownership, recognized him as the owner nine years during his life, and left him in peaceable possession at his death, and that this possession continued, open and visible to all the world, up to the time of the purchase by these complainants.

All these are continuing representations of Aaron Thomas, which did not end with his death, but tended as directly and as strongly to induce complainants to act upon them as any representations he could have made, during his life, to complainants in person. His death took nothing from the effect of these acts and representations; and to hold that his heirs are not to be bound by them, because the purchases were not made till after his death, would, in my view, be little less unreasonable than to hold that a grant by deed could not bind his heirs. It is doubtless true, that if the heirs had discovered the mistake after the death of Aaron, and had taken possession of the land omitted by the mistake, or had instituted proceedings for its recovery from Alanson, before complainants purchased, they might not have been estopped by these acts and representations of their ancestor; because complainants would not then have been deceived; the possession by the heirs, or the pendency of the suit for its recovery, would have been notice to them of the claim of the heirs, and consequently of the mistake.

I can not admit that there is any principle of law which limits the effect of such acts and representations to the period of a man's own life, or which prevents his heirs being bound by them after his death, wherever he would be bound by them if living. Nor that there is any principle which confines the rule of equitable estoppel to such representations as are made directly, and in person, to the parties acting upon them. Whether direct or indirect, in the presence or in the absence of the parties, is immaterial, so that they are calculated and intended to produce, and do produce, the end.

But, 4th, it is also in evidence that Mr. Backus, the counsel and adviser of Aaron and Alanson during their lives, and who frequently had both the deed and the patent in his possession; who had alway heard both speak ofs the farm as Alanson's, and never heard from either any fraudulent purpose connected with the deed, nor ever discovered the mis. take,—was inquired of by these complainants as to the title

before they purchased, and he informed them that a deed from Alanson would be good.

It is true that, on the death of Aaron Thomas, the powers of Mr. Backus, as his attorney, ceased. But his death did not obliterate the impression, nor take back the information he had imparted; and Mr. Backus doubtless acted upon that information in perfect good faith, and was entitled to act upon it, when he advised these complainants that the title of Alanson Thomas was good. If Mr. Backus, and, through him, the complainants were misled, the acts and representations of Aaron Thomas tended to mislead them.

I think, therefore, that Aaron Thomas can be no more at liberty to insist upon his fraud, the want of consideration or the mistake in the deed, as against these complainants, than if he had been present at the sale by Alanson to them, advising it, and giving the strongest assurances of Alanson's title. The case is even stronger against him than any verbal representations could have made it, because no one would be so likely to rely upon any verbal assurances, as upon a solemn deed of conveyance, duly executed, acknowledging full consideration, and followed by many years of peaceable possession under it.

It is well settled at law, that where goods are obtained by fraud, under circumstances which would render the sale void between vendor and vendee, and the vendor has furnished, however innocently, to the vendee any of the evidences of ownership, calculated to mislead a purchaser, and the goods are purchased *bona fide* from the fraudulent vendee, relying upon such evidences of ownership, such purchaser will hold against the innocent vendor.—*Ash v. Putnam*, 1 *Hill*, 307; and see *Rowley v. Bigelow*, 12 *Pick.* 307 (which perhaps goes too far); *Peabody v. Fenton*, 3 *Barb. Ch. R.* 451, and *Lupin v. Marie*, 2 *Paige*, 169.

In the case of *Teasdale v. Teasdale*, *Sel. Ca. Ch.* 59, it was decided that, even where a person has been induced to become a purchaser by the misrepresentation of another

6 MICH. — I.

*ignorant of his own right,* but where he ought, as a prudent man, to have had notice of it, equity will grant relief to the purchaser.

But the cases before us are much stronger, and it seems to me, stand upon the ground of that numerous class of cases, where the party, knowing his rights, willfully conceals them, encourages another person to purchase, and, when the purchase has been made on the strength of the representations, seeks to take advantage of his own wrong to the injury of the purchaser; as in *Savage v. Foster,* 9 *Mod.* 35, *Ibbottson v. Rhodes,* 2 *Vern.* 554. Shall the fraud of a party shield him when his ignorance would not? When others have been induced to purchase property on the strength of his representations, shall he be allowed to excuse himself on the plea that he only meant to defraud creditors, when the allowance of the excuse would defraud purchasers also?

In every view I have been able to take of this case, I am compelled to look upon these complainants as bona fide purchasers, without notice of the fraud, want of consideration, or mistake; and this is simply giving effect to the purchase according to the actual understanding and intent of the parties.

But here the broad ground is taken (though no such objection was urged on the argument), that a purchase in good faith and for a valuable consideration, is no ground to sustain a bill for relief in a court of equity, though it is a good defense; and for this my brethren have cited *Beekman v. Frost,* 18 *Johns.* 544 (in which the Court of Errors reversed the opinion of Chancellor Kent by a vote of 15 to 10); and *Jackson v. Cadwell,* 1 *Cow.* 622. The latter case decided nothing of the kind, and could not, as it was an action of ejectment; but it contains a mere *dictum* to that effect by Woodworth J. But in the case of *Beekman v. Frost,* the broad unqualified language used by the court would carry the rule nearly to the extent claimed by my brethren, though the case before the court by no means

QUIRK v. THOMAS.

warranted such an extent of application. But if the rule be admitted to the unqualified extent there stated, as I understand the language of the court, it would not apply to the cases before us; as I think the language of the decision applies only where the bill basis the claim for relief on that ground. My brethren seem to have taken it for granted that such is the case with the bills in the cases before us.

But these bills do not claim relief on this ground, as respects the fraud between the Thomases. This is no part of the case made by the bills, nor do they in any manner allude to the fraud. The defendants have undertaken to set up this fraud in their defense. As to this they are the assailing party; and if admissible at all (as I think it is not), they have the affirmative of the issue, and must prove notice to complainants of the fraud, instead of requiring the complainants to prove the negative.

The present cases are not, then, within the reason given for the rule in *Beekman v. Frost*, if that reason be the true one. It is true these bills claim that complainants purchased bona fide, without notice or knowledge of the mistake; but so much would have been necessary had they purchased directly from Aaron Thomas, and the mistake had occurred in his deed to them.

But, relying upon the general language of the court in *Beekman v. Frost*, my brethren have laid down the rule as one of universal application to all complainants who may happen to be bona fide purchasers, without exception or limitation. But the language of judicial decisions must not be taken abstractly, without reference to the facts of the case to which it is applied; and where general language is used, it can not be taken as authority further than justified by the case; and construing the decision in *Beekman v. Frost, secundum subjectam materiam*, it only justifies the application of the rule there laid down, to bona fide purchasers who do not show an equity superior to that of the defendant.

That there are cases, and a great variety of them, in which a bona fide purchase might be a good defense, and yet no ground for relief, I do not deny; because a court of equity will not grant affirmative relief to a complainant who does not show a right superior to that of the defend-ant—in other words, superior equity (I here use the terms in the broad sense, including cases of equal equity prior in time, or coupled with the legal estate). If the equities are equal, *potior est conditio defendentis.*

But so strong is the position of a bona fide purchaser in a court of equity, that the court will sometimes pro-tect him as defendant, even where the complainant shows a superior right; as, for instance, where complainant shows an equal equity coupled with the legal estate — *Joyce v. De Moleyns*, 2 *J. & L.*; and *Bowen v. Evans*, 1 *Ibid.* 264 (*cited Lead. Ca. in Eq. note to Basset v. Nosworthy*); and even though complainant be in possession under his legal title. — *Wallwyn v. Lee*, 9 *Ves.* 24. This would seem to depend mainly, if not entirely, upon considerations connected with discovery—the court refusing to appeal to the conscience of a party to make discovery when he has in good faith parted with his money in ignorance of the conflicting right.

In all such cases, and in all others where such pur-chaser can not show a superior equity (in the sense in which I have used these terms), he could not, certainly, obtain relief as complainant. But that there is any established rule in a court of equity which denies relief to a bona fide pur-chaser who shows equities superior to those of the defend-ant, I can not admit. I can discover no principle on which such a rule can be justified; and the decisions cited, when considered with reference to the subject-matter, will justify no such conclusion. And after a careful examination, and much reflection, I must declare my conviction that the rule, as broadly stated in *Beekman v. Frost*, and by my breth-ren in this case, has no existence—that it exists, in fact, *only* as it is based upon, and forms an instance in illustra-

tion of, the more general rule, that complainant must show equities superior to those of the defendant. If the bona fide purchaser show such superior equity, is it sufficient reason for denying relief, to say to him "This court does not grant relief to a bona fide purchaser"? He is surely entitled to ask the reason why; and it seems to me it would be exceedingly difficult to give one which could be appreciated by a man of plain common sense. What right have the court to erect an arbitrary barrier of this kind against the rights and equities of parties, and to shield themselves under the plea of infirmity self-imposed? It is as great a wrong to deny relief in such a case, as to grant it where it is not due. Either is an abuse of power. The pressure of these considerations has been felt by those who feel bound to acknowledge the existence of the rule as one of universal application too firmly established to be shaken. And great pains have been taken, and much ingenuity exercised, to discover a reason. Such was the course of the court in *Beekman v. Frost;* and yet my brethren agree with me that the reason there given (the oath of the party) is not sufficient for a case like these before us; and my brethren seem to think it is not the true reason of the rule, and they give a new, but what they deem the true, reason, viz., "That the right of a bona fide purchaser is an imperfect right."

I am not sure that I comprehend this reason. It does not convey to my mind any clear or definite idea. If by an "imperfect right" is intended a mere equitable, as distinguished from a legal, right, then it is too broad, and would materially narrow the limits of recognized equity jurisdiction. If it be intended to declare that the right is imperfect only in the sense that, though recognized as a good defense, it is not recognized as sufficient ground for equitable relief, then it is simply giving in *another form of words* the *rule itself*, as the *reason* of the rule. There is no difficulty, it seems to me, in discovering the reason

of the rule in all cases to which it is applicable, viz., where the complainant does not show a superior equity. And it is not a little remarkable that the court in *Beekman v. Frost* should have taken so much pains to find a reason for the universality of the rule, when they have actually (though it would seem almost unconsciously, if they understood it to be universal) given the true reason for its application to the case before them. Thus, Judge Spencer after broadly stating the rule, says (p. 562), "If the defendant has an equal claim to the protection of a court of equity to defend his possession, as the plaintiff has to assert his right, the court will not interfere on either side." And though my brethren have given a new, and, as I think, an unsound reason for the rule, yet when they come to illustrate the rule by the example of a bona fide purchaser of a horse, the true reason appears in the illustration; viz., that complainant must have the superior equity. It is evident to me that the court in *Beekman v. Frost*, notwithstanding the broad, general language used, did not understand the rule as applicable to a case where the complainant showed superior equities; and the only case upon which that opinion purports to rest is *Patterson v. Slaughter*, Amb. 293. Little reliance can be placed upon the accuracy of this reporter (see *Preface to Eden's R. and* 1 *Kent*, 460). It was merely a motion to take an answer off the files, and to file a new one setting up a bona fide purchase by defendant's grantor. It had been claimed, in opposition to the motion, that defendant might file a cross bill; and against this suggestion Lord Hardwicke is made to use the general language cited in *Beekman v. Frost*, without giving any reason whatever. Other grounds are stated sufficient for granting the motion, as it was granted. If Lord Hardwicke used the general language attributed to him, it was doubtless perfectly correct as applied to that case, which (though the case is imperfectly stated) I think was a case in which the defendant could not have shown superior equities. The case, I think, has never been under-

stood, in England, to carry the rule to the extent now claimed for it; and I do not find that it has ever been cited there for such a purpose; and, both before and since, the rule has been otherwise understood in England. In the leading case of *Basset v. Nosworthy* (*Rep. temp. Finch*, 102), Lord Keeper Finch, speaking of a *bona fide* purchaser, declares, "equity will not disarm a purchaser, but *assist him.*" And the cases are numerous in which relief has been given to a bona fide purchaser as complainant. See the cases collected in note to case last cited (*Lead Ca. in Eq.* 46 *to* 50); and see *Shine v. Gough*, 1 *Ball & Be.* 436, where affirmative relief was given on this ground as against the holder of the legal title who had recovered in ejectment.

In the great majority of cases where the rights of a bona fide purchaser have come in question, it is doubtless true that such purchase would only be good as a defense, because the question has generally arisen between two purchasers from the same grantor, immediate or remote, or upon analogous principles; and this is what is generally understood by the terms bona fide purchaser, as mentioned in the books; and few *such* cases can arise, where, if the defendant were complainant, the opposite party would not have an equal equity. It is also true that such bona fide purchase is most frequently set up by a defendant, because he is generally the party in possession, and therefore the party attacked. The cases before us are, I think, the first in which the rule in question was ever sought to be applied as between the purchaser and his grantor, mediate or immediate, especially where the equities of the purchaser were superior to those of the grantor. It is easy to see that, in cases between a bona fide purchaser and his vendor, such purchaser is quite as likely to have the superior equities as the grantor. The cases before us are an example in which all the equities are on the side of the purchaser, and none are even claimed to exist on the part of the vendor, Aaron Thomas, or his heirs. Mr. Hare, in his note (*Leading Ca. in Eq. vol.* 2, *part* 1, 54 *to* 56), condemns

the generality of the rule in *Beekman v. Frost*, but uses the following language, which my brethren have quoted: "There can be no doubt that a defense resting on the ground of a purchase for a valuable consideration as technically made by plea, which does not allege the existence of a good title in the vendor, and which, as remarked by Lord Eldon, implies a want of title in the vendee, can not, in itself, furnish a ground for a suit or action in a court of equity or of law." If this language be claimed to apply to the present cases, I have only to remark that, within the meaning of the language above quoted, Aaron Thomas, who had the legal estate, is the vendor of these complainants; and the reference by the author to the language of Lord Eldon, in the case of *Wallwyn v. Lee*, shows that it applies to that class of cases only where the purchaser could not show a superior equity. But the want of the legal estate in complainants can be no objection to the relief asked for in the cases before us, where the very object of the bill is to obtain the legal estate. To hold that a defendant who has undertaken to convey the legal estate, but has failed to do so by mistake in the conveyance, can insist upon the absence of the legal estate in complainants, as a bar to the correction of the error, would neither be sound logic nor sound law. Such a proposition, when reduced to plain English, would assert that complainant should be denied the relief simply because he has not already obtained it. Equity will place the legal estate, in such case, where, in equity and good conscience, it ought to be; it looks upon that as done which is agreed to be done, and, if not done, will put the parties in the same position as if it had been done as agreed.

I think the complainants clearly entitled to the relief asked by their bill, and my only apology for so extended a discussion, is my unwillingness to sanction the establishment of rules which will not only result in the consummation of a gross fraud upon innocent parties in the cases before us, but which, I think, will operate as an encouragement of fraud in other

cases. Concurring fully in the opinion of the judge who tried these causes in the court below, I think the decrees in the court below should be affirmed.

MARTIN Ch. J.:

I fully concur in the views expressed by my brother Christiancy, and, under ordinary circumstances, I should content myself with this declaration. But the extraordinary nature of the defense set up, and the fact that the court is divided in opinion, impels me to give some of the reasons for such concurrence.

The simple narration of the facts set out in the pleadings, and established by the proofs, suggests the equity of these complainants' claim to relief. This claim, however, is met by the allegation of fraud on the part of Aaron and Alanson Thomas in the transaction between them, which resulted in the deed alleged to be defective—not fraud *inter sese,* but fraud as to creditors; and upon this defense, the heirs and the personal representative of Aaron Thomas rely to defeat such claim. A more unconscionable, and, to my mind, inequitable defense, was never set up in a court of equity That Quirk and Greusel are bona fide purchasers, for valuable consideration, from Alanson Thomas, I can not doubt. As a general proposition, it will be conceded that such purchasers will not only be protected, in equity, in the enjoyment of their purchase, but they will be aided against the claims of those having inferior equities. It seems to be thought, however, that these complainants are not within this rule, but that the fraudulent design of Aaron Thomas inducing the conveyance to Alanson, so far vitiates that conveyance that no equities can arise upon it in behalf of any one. And it was urged at the bar that, as Alanson could not ask the interposition of a court of equity to correct the mistake in the deed to him, so as to perfect his title, his grantees can not, to perfect theirs—in other words, that his grantees stand in no better condition than himself, having acquired

only his equities.    This is certainly extending the doctrine that courts will not interfere in support of fraudulent grants, or meddle with a fraudulent transaction, in behalf of either actor, to a very great length; and if it be true, makes the fraud of the ancestor an instrument of robbery in the hands of the heir.   But this is not the correct rule.   A bona fide purchaser has often superior equities to those which his grantor might assert, and can often invoke the aid of a court of equity, when the latter would be remediless.   Especially is this the case where conveyances of property have been made for the purpose of hindering or delaying creditors.    In such case, the title of the purchaser in good faith will be protected against every one, even creditors, although that of his grantor, while the property remained in him, would not be; and this upon the well established principle that the fraud can only be set up by the creditors against the parties to it, or those who purchased with knowledge of it, while none but those affected by the fraud can impeach the title.    Now, in these cases, the complainants come into court as bona fide purchasers, and ask that the title which they purchased, and which was intended to be conveyed to them, and which they, and all parties, supposed, until after the death of their grantor was conveyed to them, shall be assured to them; and for protection against the suits brought by the heirs and administrator of Aaron Thomas, founded upon the lately discovered mistake in the deed from Aaron to Alanson.   I say lately discovered mistake, for I can not for a moment suppose, in the face of the evidence, that Aaron Thomas ever knew that his deed granted no land, and that he twice deliberately perjured himself in swearing that the premises were Alanson's, and that he had no title remaining in himself.

Had the deed from Aaron to Alanson perfectly described the lands intended to be conveyed by it, the latter would have held a perfect title as against all the world, except creditors thereby defrauded.   Neither Aaron nor his heirs would be per-

mitted to allege any thing against it: Aaron, because, he would not be permitted to set up his own fraud to impeach the title—his heirs, because they succeed to no greater rights or equities than their ancestor had. While it is true, as a general, and as to parties an universal, proposition, that courts of equity will not interfere to enforce a fraudulent contract, nor to assist the parties to it in any manner, it is equally true that they will protect bona fide purchasers against all equities not superior, and assist them against all which are inferior. The equity of a party directly participating in a fraudulent transaction, or of his heirs or personal representative, whose claims can only be co-extensive with those of the ancestor, are most certainly inferior to those of one who has purchased in good faith, and paid thereupon a valuable consideration. Under such circumstances, the abhorrence of equity towards fraud yields to its care for the rights of the bona fide purchaser, and the superior equity of the latter overrides the inferior equity of the former. When the equities are all on one side, without the shadow of an opposing equity, such is most certainly the rule.

Now, as already suggested, were Aaron living, he could not be heard to allege his own fraud in opposition to the relief sought by these complainants. By parting with their money upon the faith of the transaction between him and Alanson, and in the supposition, by all parties, of a good title in Alanson, they acquired the superior equities, and the perfect right to have the mistake corrected, so far as their own purchases are concerned; and Aaron would be compelled to protect their titles thus innocently acquired. If the heirs have no greater rights than the ancestor, then the relief is equally attainable as against them.

It appears to be supposed that the relief sought, if granted, will be the enforcement in fact of the contract between Aaron and Alanson, and it is urged that such a contract, if proven, would be void, and consequently the relief is impossible. I think these grounds to be wholly untenable. In case a bill was filed by Alanson to correct the mistake, it would doubt-

less be incumbent upon him to show the contract, according to the terms of which he seeks to have the correction made; and this upon the ground that he is seeking to enforce the contract of conveyance which has been imperfectly executed. But the error in the present case consists in holding that the relief, if given, will operate as the enforcement of the contract as between them. It is upon no such foundation that these complainants stand in court. Their equities are altogether independent of, and superior to, those of Alanson, and depend upon no contract between him and Aaron, but upon the facts of an attempted and supposed conveyance from Aaron to Alanson, the surrender of possession by Aaron under it, the occupancy by Alanson, their purchase from him, and giving value, and the inducements to such purchase held out to them through the uniform recognition by Aaron of Alanson's title and right to convey, and the former's repeated oaths and asseverations to that effect. Even in case of a voluntary conveyance, accompanied by surrender of possession, a second or subsequent grantee would have a right to the remedy here sought, although no contract had ever existed. The equity is that of protection of a title innocently acquired—not, as would be the case if Alanson brought the bill, of enforcement of an agreement improvidently executed. If this be not so, the doctrine of protection to bona fide purchasers is an idle boast.

But if such contract were proven, would it be void so that no relief could be granted in this case? So long as the contract was *in fieri* it could not be enforced by the parties to it, if made with a fraudulent intent; but when executed, it is valid as to all the world, except those creditors it was designed to defraud, and void as to them only upon their taking legal steps to annul it. In the present case, the contract, if any existed, must be held to have been executed, so far as these complainants' interests are to be affected. In their behalf, the maxim of equity, that "What is intended to be done, will be presumed to have been done," will have its full force

in order to enable them to correct the mistake in its performance.

The fraud, then, set up in this case being one which is only available to creditors, the heirs of Aaron Thomas can not be permitted to allege it in protection of their claims against the title of these complainants, nor to defeat any relief which may be necessary to perfect the evidences of that title. Nor can they avail themselves of it as an instrument of oppression to deprive these complainants of their honestly acquired property. If it can be made available to them for these purposes, it will only be on the ground that courts of equity hold fraud in such abhorrence that, rather than sustain any transaction however remotely tainted with it, they will refuse to interfere respecting it, but, standing by, will suffer a grosser fraud to be perpetrated upon innocent parties who may have the misfortune to acquire rights growing out of such transaction.

The decrees of the court below must be affirmed, with costs.

The court being thus equally divided in opinion, the decrees of the court below were *affirmed.*