Evans v. Funk.

---

## DANIEL EVANS

### V.

## JOHN FUNK.

*Attorney and Client—Probate Judge—Right to Act as Attorney—Evidence—Sec. 10, Chap. 13, R. S.*

1. It is the duty of a probate judge to keep himself free from any and all interest in any estate in process of settlement in his court, which might influence or warp his judgment in the slightest degree.

2. A county or probate judge in this State may try cases in other courts than his own, when such cases have no connection with the business or causes pending in their own courts.

2. In an action to recover a certain sum alleged by plaintiff to have been paid defendant when judge of probate, to be used by him, or so much

thereof as might be necessary, to settle a law suit, the balance, if any, to be returned, it being claimed that no part thereof had been used or returned, this court holds, defendant contending that said amount was paid him as attorney's fees for procuring a settlement of said suit, that the evidence supports the theory of the plaintiff; that the rule that when two or more persons engage in an unlawful enterprise or agree to do an illegal act or one prohibited by public policy, and spend or pay out money to each other or otherwise in aid of such unlawful enterprise, the law will aid neither but leave them where they placed themselves, can not be invoked in the case presented; that assuming that said payment was made to defendant as plaintiff's attorney, the parties were not *in pari delicto* in the employment of the one by the other, nor in the payment to the one, and the receipt by the other, of the sum in question; and that the judgment for the plaintiff must be affirmed.

[Opinion filed December 8, 1890.]

APPEAL from the Circuit Court of La Salle County; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. MAYO & WIDMER and BREWER & STRAWN, for appellant.

The statute (Sec. 10, Chap. 13, R. S. 1874), declares, "No person who holds a commission as a justice of the Supreme Court, or as judge of any court of record, shall be permitted to practice as an attorney or counselor at law in the court in which he presides." The prohibition is leveled only against practicing law, by the judge, in the court in which he presides, and the maxim was never more applicable than when applied to the interpretation of a statute, that *expressio unius est exclusio alterius.* Broom's Maxims, *638. Instead of prohibiting, the statute impliedly admits, any judge of any court in this State to practice law anywhere and everywhere except in his own court. Nor does the statute limit him to any special practice. He may have a private office and there conduct a general practice, if he sees fit. He may give advice, examine and pass upon titles, drafts, wills and other instruments, and prepare for and conduct the trial of suits in any other court than the one in which he presides. We do not mean that he is permitted to act as an attorney or counselor at law in any matter that is being litigated in his own court. When a

judge practices law there is always a possibility and some-
times a probability, that the matter in which he acted as an
attorney, or something connected therewith or arising there-
from, may afterward come before the court in which he pre-
sides, for adjudication. In that event, he might be disquali-
fied to act as judge, by reason of his previous connection as an
attorney with the subject-matter of the litigation. But no
one supposes that such possibility, or even probability, how-
ever strong, disqualifies the judge from acting as an attorney
and receiving compensation therefor. The disqualification is
the other way—it goes to the judge because he has acted as
attorney, not to the attorney because he may be called to act
as judge.

In Town of Bruce v. Dickey, 116 Ill. 527, it was held that
a judge of the Supreme Court could recover for services
rendered as an attorney while he was a judge of that court.
It is true, the services for which that suit was brought were
rendered in the Federal courts, but they extended over a con-
siderable number of years, during all which time there was a
liability that something arising out of the subject-matter in
controversy in the Federal courts would come before our
Supreme Court for its determination. Besides, there is noth-
ing in the opinion of the court to show that the case would
have been decided otherwise than it was, had the services been
rendered in the State courts, other than the Supreme Court.

Now, in what respect was the conduct of Judge Evans for-
bidden by the statute, or by the common law? Wherein was
the illegality of his transaction? Strictly speaking, the bring-
ing about of a settlement of a legal controversy is not practic-
ing law; no license as an attorney is required on the part of
one who performs such services; they may be rendered by
any one who has the requisite tact and common sense. But
waiving that question, and assuming that when such services
are performed by an attorney, as in this case, they are profes-
sional, it must be conceded that the thing accomplished—the
settlement of the Reddick will suit—was not unlawful. The
law does not forbid or discourage, but favors, the compromise
of lawsuits. Why might not Judge Evans conduct the nego-

tiations and bring about the settlement of the Reddick will suit? The suit was pending in another court. The matter to be determined there, was the validity of the will. By no possibility could that matter afterward come before the Probate Court for adjudication. But the ninth instruction asserts that the law's prohibition against the judge of a Probate Court acting as an attorney, extends to all suits pending in other courts, which are so connected with an estate pending in the Probate Court as to require of the Probate Court official or judicial action with respect to the same; and it is implied in that instruction that a suit in the Circuit Court to set aside a will has such a connection with the estate pending in the Probate Court, that it is unlawful for the judge of the Probate Court to act as an attorney in securing a settlement or compromise of such will suit, and therefore it is unlawful for him to ask or take pay for his services in that regard; for if the law does not prohibit him from performing the services, if it is lawful for him to render them, he may lawfully claim and receive his pay.

We submit that it was not unlawful for Judge Evans to receive the money in question; but, if it was unlawful, it does not follow that the plaintiff is entitled to recover it back.

No rule of law is better settled than that money voluntarily paid in consideration of the payee doing, or agreeing to do, something opposed to public policy, can not be recovered back. Liness v. Hessing, 44 Ill. 113; Arter v. Byington, 44 Ill. 468; Smart v. Cason, 50 Ill. 195; Skeels v. Phillips, 54 Ill. 309; Neustadt v. Hall, 58 Ill. 172; Craft v. McConoughy, 79 Ill. 346; Compton v. Bunker Hill Bank, 96 Ill. 307; Banking Co. v. Rautenberg, 103 Ill. 460; Samuel v. Oliver, 22 N. E. Rep., p. 499 (Ill.); Dunkin v. Hodge, 46 Ala. 523; Kivett v. Wynne, 89 N. Car. 37; Mudgett v. Norton, 60 Me. 260; Inhabitants of Worcester v. Eaton, 11 Mass. 368; Tyler v. Smith, 18 B. Mon. 793; Clarke v. Lincoln Lumber Co., 59 Wis. 662; Groton v. Inhabitants of Waldoborough, 11 Me. 306; State v. Lazarre, 12 La. Ann. 166; Miller v. Larson, 19 Wis. 468.

The case of Village of Dwight v. Palmer, 74 Ill. 295, we

submit, does not militate against the rule above stated. There, the money was not voluntarily paid by the plaintiff. It was procured through the defendant's fraud, who was secretary of the village board and obtained the money by filling up a blank order that had been signed by the president of the board, for another purpose than to pay the defendant.

As he was not ignorant of the facts, what lawful excuse has John Funk for paying to Judge Evans money which the latter could not lawfully receive? If the transaction was unlawful, if it was against public policy, why are not the parties *in pari delicto?* We grant there are cases where the courts will inquire into the relative turpitude of parties to an illegal transaction, but this is not one of them. In Smith v. Cuff, 6 M. & S. 160, money had been paid by way of secret preference to induce a creditor to sign a composition deed. It was held it could be recovered back. Lord Ellenborough said: "This is not a case of *par delictum;* it is oppression on one side and submission on the other. There was inequality of situation between the parties; one was creditor, the other debtor, who was driven to comply with the terms which the former chose to enforce." Crossley v. Moore, 40 N. J. Law, 27, was decided for the plaintiff on the same ground, that the money was procured by compulsion arising from the situation of the parties. The same rule was applied in Browning v. Morris, Cowp. 790-2, to payments of usurious interest, where Lord Mansfield declared the law to be that, "where contracts or transactions are prohibited by positive statutes, for the sake of protecting one set of men from another set of men, the one from their situation and condition being liable to be oppressed or imposed upon by the other, there the parties are not *in pari delicto,* and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract." And in Smith v. Bromley, 2 Doug. 696, note (cited in White v. Franklin Bank, 22 Pick. 186), he laid down the doctrine: "If the act is in itself immoral, or a violation of the general laws of public policy, then the party shall not have this action; for where both parties are equally criminal against such general

laws, the rule is *potior est conditio defendentis.* But there
are other laws which are calculated for the protection of the
subjects against oppression, extortion, deceit, etc. If such
laws are violated, and the defendant takes advantage of the
plaintiff's condition or situation, there the plaintiff shall
recover." In cases under such statutes, the reason for hold-
ing the parties are not *in pari delicto,* is that the statute
itself distinguishes between them; "it is very material that
the statute itself, by the distinction it makes, has marked the
criminal, for the penalties are all on one side—the office
keeper." Jaques v. Golightly, 2 W. Bl. 1073; Browning v.
Morris, *supra;* and see Tracy v. Talmadge, 14 N. Y. 181.

In respect to offenses in which is involved any moral
delinquency or turpitude, all parties are deemed equally
guilty, and courts will not inquire into their relative degree
of guilt. Lowell v. Boston & L. R. R. Co., 23 Pick. 32;
Atlas Bank v. Nahant Bank, 3 Met. 581.

In Clark v. Lincoln Lumber Co., *supra,* the plaintiff pur-
chased from the company stock at less than its par value,
which the statute forbade the company from issuing at less
than par. He tendered back the stock, which proved to be
valueless, and sued to recover back what he had paid. It was
held he could not recover. The statute only forbade the issue
of the stock at less than par value, not its purchase, and it
was urged that the purchaser was, therefore, not *in pari de-
licto.* The court said: "There is no force in the argument
that the law does not forbid the purchase of the stock of the
company at less than its par value, and that therefore the pur-
chaser is not a violator of the law, although he purchases at
less than par; the purchaser is the aider and abettor of the
corporation which makes the illegal issue, and is equally as
guilty of a violation of the statute as the corporation which
issues the stock; this court as well as nearly all other courts
has held that public policy and purity in the administration
of justice, forbids a court from entertaining an action when the
plaintiff's claim arises out of a contract made in violation of
a statute, or which is against public policy or morality; and
when a party has delivered his property upon such contract

to another, or paid his money on it, he can not maintain an action to recover it back. The general rule of law is, that all contracts which are repugnant to justice, or founded upon an immoral consideration, or which are against the general policy of common law, or contrary to the provisions of any statute, are void; and that if a party claiming a right to recover a debt is obliged to trace his title or right to the debt through any such illegal contract, he can not recover, because he can not be allowed to prove the illegal contract as the foundation for his right of recovery. It is quite immaterial whether such illegal contract be *malum in se* or only *malum prohibitum;* in either case the maxim *et turpi causa non oritur actio* is applicable."

Messrs. D. B. SNOW, DUNCAN & GILBERT, and O'CONOR, DUNCAN & ECKELS, for appellee.

It is contended that though Evans could not lawfully act as attorney, nevertheless Funk can not recover the money paid, and to sustain this contention resort is had to the maxims, "*Ex turpi causa non oritur actio*," and "*In pari delicto melior est conditio defendentis.*"

It is undoubtedly true, as a general rule, that money paid in consideration of the payee doing or agreeing to do something immoral, illegal or opposed to public policy can not be recovered back. This rule, however, like all others, has its exceptions, as will be found by reference to the authorities. Public policy lies at the basis of the law of illegal contracts, and all general rules are made to yield to this policy.

In Greenhood on Public Policy, page 90, under the head of rule 98, it is said:

"But when money is paid to one in consideration of something opposed to public policy, or on a contract opposed thereto, and there is a moral compulsion on the part of the payor to pay it, or to make the contract, or where the law regards the payee as the principal offender, and its policy is aimed at his part in the transaction, and is adopted for the payor's protection * * * it may be recovered."

In Browning v. Morris, Cowp. 790, 792, Lord Mansfield said:

"Where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men, the one from their situation and condition liable to be oppressed or imposed upon by the other, there the parties are not *in pari delicto*, and, in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract."

In Smith v. Cuff, 6 M. & S. 160, Lord Ellenborough said:

"This is not a case of *par delictum;* it is oppression on one side and submission on the other; it never can be predicted as *par delictum* when one holds the rod and the other bows to it."

In Story's Equity Jurisprudence, Sec. 300 *et seq.*, the law is laid down as follows:

"In cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto;* for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offense. And, besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy, in many cases, however reprehensible the acts of the parties may be."

Without quoting further from the authorities, we shall content ourselves by referring the court to the following cases where this question is fully and elaborately discussed and the rule laid down that where parties to a contract or transaction, not *malum in se*, but prohibited by statute, are not equally guilty, courts may afford relief to the less guilty party. White v. Franklin Bank, 22 Pick. 181; Tracey v. Talmage, 14 N. Y. 162, 193; Curtis v. Leavitt, 15 N. Y. 284–292; Quirk v. Thomas, 6 Mich. 111, and cases cited; 1 Smith's Leading Cases, 708.

Upon considering the facts in this case in the light of the rules laid down in the authorities above cited and of other elementary principles familiar to the merest tyro in the profession, it will satisfactorily appear there are several sufficient reasons why the defendant could not successfully rely for his defense upon the maxims in question, even if the evidence showed that the plaintiff at the time of the alleged employment of the defendant was fully cognizant of the facts which rendered it unlawful for defendant to render the services.

It is laid down by numerous authorities that an attorney owes to his client fidelity, secrecy, diligence and skill; and he can not, therefore, serve professionally both parties to a controversy, nor take a reward from the other side. 1 Wait's Actions and Defenses, 448; Yardly v. Ellill, Hob. 8a; King v. Shore, Cro. Eliz. 814; Herrick v. Catley, 1 Daly (N. Y.), 512; Sherwood v. Saratoga, etc. R. R. Co., 15 Barb. 650; Dunlop v. Richards, 2 E. D. Smith, 181; Watkins v. Cousall, 1 E. D. Smith 65; Loyd v. Galston, 5 Bush (Ky.), 587.

It is obvious, therefore, that an attorney violates one of the essential terms of his contract with his client when, without the knowledge of the client, he accepts adverse employment, and if, in such case, he brought an action for his fees, which would, of course, be an action on the contract, he would necessarily fail, because he could not expect the court to enforce a contract, one of the essential terms of which he had himself violated and disregarded.

In the case at bar the parties are, so far as this question is concerned, in the same position that they would be in had no money been paid and the suit were one by the attorney to recover the fees. As Evans had no legal right to the fees and Funk paid them without a knowledge of the facts which relieved him of liability, he is in the position of one having paid money through mistake of fact brought about by the defendant's unlawful concealment and he can therefore recover.

But there is another ground upon which, taking Evans' testimony to be true, the plaintiff was entitled to recover, and that is that the defendant, by his own showing, had on the occasion of his first employment by Sis Reddick made a con-

tract with her by the terms of which he was to act as her legal
adviser at a compensation then fixed at $500, and the law is
well settled that under such circumstances, after the relation
of attorney and client has commenced the attorney will not
be permitted to stipulate for a larger compensation than that
originally agreed upon.

In Lecat v. Sallee, 3 Porter (Ala.), 115, the complainant
entered into an agreement with the defendant, an attorney at
law, for the performance of certain professional services at a
compensation then agreed upon, which agreement was subse-
quently modified so as to provide for a greater compensation.
The question presented in the case was whether the subse-
quent agreement was valid, and upon that question the court
said:

"Upon these facts the question arises, can the attorney
during the connection between his client and himself make
with his client a binding contract to secure to himself greater
compensation for his services than was agreed upon when
their relation commenced?

"The question has never before been presented to this court
but it has been often determined in England. There it is a
settled doctrine of equity that an attorney can not, while the
business is unfinished in which he has been employed, receive
any gift from his client, or bind his client in any mode to
make him greater compensation for his services than he would
have a right to demand if no contract should be made during
the relation. If an attorney accept a gift from one thus con-
nected with him it may be recovered in a court of chancery
by the donor or his creditors, should it be necessary for them
to assert a right to it to satisfy their demands.

"If a bond or any other security for a greater compensa-
tion be taken from the client by his attorney during their con-
nection, it will, upon an application to a court of equity, be
either set aside or allowed to stand only as security for the
sum to which the attorney would have been entitled if no
such security had been given. In some of the cases the pro-
hibition comprehends all dealings between attorneys and their
clients, in others it is confined to the particular business which

was the inducement to form the relation, and an attorney is allowed to enter into contracts with his client upon any matter which is not the object of his concern as attorney. The principle thus limited we deem the most reasonable.   *   *   *

" The counsel for the defendant attempted to maintain the position that such contracts between an attorney and his client in this State were not within this principle, because attorneys here do not form a class in the profession of law separate from that of counselors as they do in England, and the laws of the State do not prescribe the fees for services performed by attorneys or authorize the appointment of officers to tax their bills of costs.

"It is true there is a difference in these respects between attorneys in that country and in this State. There they and solicitors have a right to be paid such reasonable fees as have long been settled in the profession and allowed in the different courts and in common law and chancery business. There are officers of each of the courts whose duty it is to tax their bills of costs. In England a counsel has no right to an action for his fees, for they are given to him not as hire, but as a gratuity. If he had a right to demand fees, his contracts for them, entered into after his relation with a client had commenced, would be, doubtless, within the principle which governs such contracts with an attorney.

"In this State attorneys and solicitors, when they undertake to do business, may make the measure of their compensation a part of the contract by which they agree to perform the services needed, and such a contract would be as binding upon the client as any one in which he could enter.   *   *   *

" In this case the fee for the services was settled by the contract between the parties, the same contract by which the attorney undertook to bring suit for the complainant. The complainant knew, with certainty, what he would be bound to pay in case of success in all his suits, or in any event.   *   *   *

"As the contract which produced the relation between the parties in this case ascertained the fee of the defendant, it was as irrevocably settled as though a rule of law, which tolerated no contract upon the matter, had fixed it.   *   *   *

"The firmest ground for the support of the principle to which the complainant has resorted for relief, consists of the confidence reposed by a client in his attorney and the influence which an attorney has over his client. Confidence is as necessarily reposed here by the client in his attorney as it is in England. The influence of an attorney during the connection is as great here as it is there, and no consequence against which it is the object of justice to guard could attend such contracts there which would not follow them in this country. Integrity of character and purity of motive have never enabled such contracts to stand in full force against the principle of equity which commonly excludes all inquiry into the fairness of the transactions and sets them aside as violations of the policy of justice. No principle has been more rigidly adhered to by the English chancellors, and we shall not take the liberty to depart from it.

"The principle will best preserve the high reputation of the profession, by elevating its members above the temptation to exercise their influence to obtain advantageous bargains of their clients, and consequently above the suspicion of having done so."

The doctrine laid down in this case finds support in the following authorities: Newman v. Payne, 2 Ves. 200; Walmesley v. Booth, 2 Atk. 29; Oldham v. Hand, 2 Ves. Sen. 259; Montesquie v. Sands, 18 Ves. 312.

C. B. SMITH, P. J. This was an action in assumpsit brought by John Funk, appellee, against Daniel Evans, to recover the sum of $2,500. The declaration is the consolidated common counts with an additional averment or cause of action, to the effect that the plaintiff had before then deposited with the defendant, Evans, $5,000, to be used by the defendant, or so much thereof as might be necessary, to settle a law suit, the defendant then and there agreeing with plaintiff to return to plaintiff said sum of money, or such part thereof as was not used in making such settlement, and that defendant did not use said sum, or any part of it, in making the settlement. The plea was the general issue. A trial resulted in verdict for appellee for the sum of $2,500. After overruling motions

for a new trial and in arrest of judgment, the court gave
judgment on the verdict.   Appellant now brings the record
here on appeal and assigns various errors.

The material and important facts out of which this contro-
versy arises, and which are necessary to a correct understand-
ing of the case are about as follows:   William Reddick, a
citizen of La Salle county, died testate in 1885, leaving a large
estate.   To his own blood relations he gave but a small por-
tion of his estate.   Elizabeth Reddick was an adopted daughter,
and to her he gave the sum of $40,000.   He gave to the
county of La Salle land worth about $12,000, and to the city
of Ottawa he gave about $150,000 for the purpose of estab-
lishing and maintaining a public library.   He appointed
George W. Armstrong as his executor, and directed that
Marshall N. Armstrong, the son of George W., should be
employed as the attorney for the estate and be properly
compensated for his services in that respect.

After the death of William Reddick this will was duly
admitted to probate before appellant, who was then probate
judge for LaSalle County.   Appellant, Evans, was elected
probate judge in 1882, and was still the incumbent of that
office during the whole period of time covered by the various
transactions involved in this suit, and was in the exercise of
the functions of his office.   The heirs and relatives of William
Reddick were not satisfied with the will, and shortly after it
had been admitted to probate they filed a bill in chancery in
the Circuit Court of LaSalle County, to contest and avoid the
will of William Reddick.   Every one known to have any
interest in the estate, either as devisees, heirs or executors,
were made parties to this bill.   The heirs who prosecuted the
suit, for the purpose of convenience appointed one Jack
Reddick their attorney in fact to bring, control and manage
the suit in their interest.   Jack Reddick was a nephew of
William Reddick but not an heir (as his father was then
living).

Issues were joined on this bill and in due time a trial was
had before a jury resulting in a disagreement.   This was in
December, 1886.   Shortly after the failure of the jury to

agree, negotiations for a settlement were begun, which finally
resulted in a settlement of the will contest. The settlement
resulted in George W. Armstrong, the executor, paying to
Jack Reddick, for the heirs of William Reddick, the sum of
$7,000, in consideration of the entry of a decree by the court
confirming the will of William Reddick. By the terms of this
settlement the directors of the public library fund had agreed
with George W. Armstrong, that he might pay to Jack Red-
dick the full sum of $7,000 out of their share of the estate,
unless he could get John Funk, appellee, to contribute some
portion of the $7,000 out of his share of the estate. And
that Armstrong might charge the whole of the $7,000 to their
portion of the estate unless he could procure some portion of
it from Funk. Prior to this settlement Elizabeth Reddick
had died, and John Funk, then supposed to be her only brother
and heir, became entitled to the $40,000, which had been
willed to his sister, Elizabeth, the adopted daughter of William
Reddick.

During the pendency of the chancery suit to contest the
will, and until the cause was finally settled and a final decree
entered in the Circuit Court sustaining the will, the adminis-
tration of the estate in the Probate Court had been in abey-
ance, but the administration was still pending.

Appellant was not an attorney of record for any of the par-
ties to the chancery suit, so far as this record discloses, nor
does he appear to have taken any part in the management or
trial of the cause in the Circuit Court. Elizabeth Reddick
during her lifetime and during the trial was represented by
Messrs. Mayo & Widmer, her solicitors. The first connec-
tion which appellant appears to have had with the case was
to propose and insist on a settlement of the controversy
among the various parties to the suit. After frequent inter-
views by appellant with Jack Reddick, George W. Armstrong,
the library directors and John Funk, it was agreed that Jack
Reddick should be paid the sum of $7,000 in full of all claim
made by the heirs, and as before stated this entire sum was to
be paid out of the library fund unless Armstrong, the execu-
tor, could pursuade John Funk to pay his proportion of that

sum out of his $40,000, which he had inherited from his sister, Elizabeth Reddick. But Funk refused to pay to Armstrong any part of the $7,000, saying he had already paid his share to procure a settlement.

Appellant admits that during the progress of the settlement John Funk paid him the $2,500 on his, appellant's, demand or request, but he claims that it was paid to him for attorney's fees for procuring the settlement. In procuring this settlement it is clear to our minds from the evidence that appellant was representing the various conflicting interests to that suit in a secret and clandestine manner. In his various interviews with appellee, Jack Reddick, and perhaps with Armstrong, he enjoined upon each secrecy.

Appellee testifies that appellant invited him to his office and urged upon him the importance of settling, and that he thought with what money the library board was willing to pay, that if Funk would pay $1,500, he could get Jack Reddick to settle for that amount, and that after a conference with Jack Reddick appellant reported that he could not settle for that amount, and that appellant thereupon advised appellee to bring him $2,500, and that he would use no more of it than was necessary to satisfy and get a settlement out of Reddick, and whatever was left he would return to appellee. The $2,500 was thereupon handed appellant in a draft which he cashed and appropriated to his own use. None of it was ever returned. At the time the money was paid appellant, he gave appellee the following receipt:

"OTTAWA, Ill., March 10, 1887.

"Received from John Funk $2,500 for and in settlement of controversy in the Reddick will case and the professional services connected with said settlement, made this 10th day of March, 1887.

DANIEL EVANS."

The plaintiff insisted and testifies that this money was paid to appellant, Evans, for the sole and only purpose of being used to pay to Jack Reddick, as the proportional amount to be paid by him out of his share of the estate, and that no part of it was for legal services or attorney's fees.

On the contrary, appellant insists and testifies that this sum of money was paid him as attorney's fees for services which he had agreed to render to Elizabeth Reddick in her lifetime, as a confidential adviser, to procure a settlement of the will controversy, and for which appellant testifies she was to pay him $5,000 in case he succeeded in procuring a settlement.

After a careful examination of all the evidence the strong preponderance, we think, supports the theory of the plaintiff. When the bill was filed to contest the will, Miss Reddick employed Messrs. Mayo & Widmer to attend to her important interests in that case, and paid them a large sum of money for their services. There is nothing to show that they were not entirely competent to discharge the duties of their office with ability or fidelity, nor that they were not faithful and loyal to the best interests of their client, nor that she was not satisfied with their services. While it might be possible, it is certainly very improbable, and most unreasonable, that she should secretly employ another attorney and agree to pay him $5,000, to do what her solicitors might as well do if she desired it done.

It is also in proof that appellant charged Jack Reddick $300 for procuring this settlement, and that that sum was paid him by Jack Reddick. John Funk did not know this $2,500 had not been used to pay the heirs and contestants in the will controversy as his part of that payment, for a long time after the controversy was settled; nor did the board of directors of the public library, nor George W. Armstrong, the executor, nor his son, the attorney for the estate, nor Jack Reddick, the attorney in fact for the contesting heirs, know that such payment had been made by John Funk to Judge Evans, appellant, for nearly a year afterward. The receipt of the money by appellant was kept a profound secret from all the parties in interest, and John Funk himself was told by appellant to say nothing about it. The draft which appellant received for the $2,500 was not presented for payment at Ottawa, where he lived and kept his bank account, but was taken to Streator, and there a Chicago draft was purchased and that draft was placed to his credit in Ottawa. The secrecy

which appellee himself admits he enjoined upon all parties pending his dealings with them, and his efforts to procure a settlement, and the indirect methods adopted, do not, we think, tend to support his present claim that the money was paid him for legal services, and, so far as we can see from this record, it was wholly unnecessary to accomplish a settlement. We think the only purpose and object for such secret methods was to induce each conflicting interest and party to suppose that appellant was representing that separate interest as against other conflicting interests.     Such a course was well calculated to mislead the parties in interest and induce them to act on his advice, when, if they had known he was also advising their adversary, they would not have trusted him.

Without going further into the details of this transaction, as disclosed by the evidence, we shall content ourselves by saying that we are entirely satisfied with the verdict of the jury upon the facts, that this $2,500 was paid to appellant with the distinct understanding and agreement that it was all to be used in payment of the claims made by the heirs of William Reddick in the will contest, and that it was not paid to appellant for attorney's fees or for any services he rendered John Funk in that whole transaction.

But if we concede the fact to be otherwise, and to be precisely as claimed by appellant, and admit the fact to be that this $2,500 was paid to him as the attorney of John Funk for procuring the settlement, still, under that state of facts, we can entertain no doubt about the correctness of the judgment of the Circuit Court.

It is conceded that appellant was the probate judge of La Salle county during the whole period of this controversy. The will of William Reddick was probated before appellant, and he issued the letters to George W. Armstrong, the executor. The administration of the estate was necessarily suspended during the contest in the Circuit Court over the will.     As quick as that controversy was ended, jurisdiction over the entire estate was again assumed by the Probate Court, with appellant presiding judge, and with full power to make any and all necessary orders connected therewith.     It was his duty to

pass on the accounts and allow or disallow all payments made
by the executor, as the law might require.   It was his high-
est public as well as private duty to keep himself absolutely
free from any and all interest in the estate which might influ-
ence or warp his judgment in the slightest degree.   He owed
this duty to the public as a judicial officer, as well as to all the
conflicting interests of the estate, and those interested in the
distribution of the property.   According to his own claim,
made in open court, he engineered a secret settlement of the
controversy over the will, which cost the estate and the
library board $7,000, and for which he received the sum of
$2,500 as the hired attorney for one of the parties in interest,
for services rendered while he was the presiding judge, and
while the case was still pending and undetermined before him
in his own court.

When Armstrong, the executor, presented his report for
approval by the court, showing that he paid out this $7,000
for the settlement, appellant approved it.   Was he free to
approve or reject this report, as the evidence or law might
require and justice demand?   If he approved it the settle-
ment stood and was final, and the money gone and the library
board short $7,000, and appellant's $2,500 was earned and safe
to his credit in his bank account.   If he rejected the report
and refused to allow it, then Armstrong must make good the
loss to the estate and might recover it back, if he could, and
the settlement would have failed and appellant be called upon
by John Funk to refund the money.

The statute of this State (1874, Chapter 13, Section 10,)
provides as follows:   "No person who holds a commission as
justice of the Supreme Court, or a judge of any court of
record, shall be permitted to practice as an attorney or coun-
selor at law in the court in which he presides."

On the trial the court gave the jury, among others, the
following instructions:

"9.   The jury are further instructed that the law prohibits
the judge of the Probate Court from acting as an attorney
and counselor at law in all matters pending in his own court,
and that this prohibition is not confined merely to suits pend-

ing in other courts which are so connected with an estate
pending in said Probate Court as to require of said Probate
Court official and judicial action with respect to the same;
and when a suit is pending in the Circuit Court to set aside
a last will and testament of a deceased person, whose estate
is pending for administration in the Probate Court, the judge
of said Probate Court is prohibited by law from soliciting or
receiving from any person interested in said estate any money,
property or other valuable thing, as compensation for induc-
ing the executor of said estate to make a settlement or com-
promise of such will suit, and this is so notwithstanding his
motives were intended to accomplish what would be for the
best interests of all parties concerned, without any wrong
intention whatever in so doing.

"10.    The jury are further instructed that it appears by the
undisputed evidence in this case that Daniel Evans, the de-
fendant in this case, has been judge of the Probate Court of
La Salle County from the first Monday of December, 1882,
down to the present time; that the last will and testament of
William Reddick, deceased, was duly admitted to probate in
the said Probate Court, and George W. Armstrong was duly
given letters testamentary as executor by said court on the
— day of March, A. D. 1885; that a suit was subsequently
commenced in this court by the heirs of said William Reddick
to set aside said will, and that said suit was finally compro-
mised and settled by the payment by said executor to said
heirs of the sum of $7,000, which payment was duly reported
by said executor to said court, and was approved by said
court, through said Daniel Evans, the judge thereof; that it
further appears that said Daniel Evans received from said
John Funk the sum of $2,500.    And the jury are further
instructed that, under the foregoing facts, even though it
appears from the evidence, and the jury believe therefrom,
that said Daniel Evans solicited and received from said
John Funk said sum in consideration of having induced said
executor to make said settlement of said will suit, the jury
must hold that the act of said Evans in soliciting and receiv-
ing $2,500 was illegal and unlawful, and that he, the said

Evans, had no legal right to solicit or receive said $2,500 from said Funk for such purpose; the law is against such a transaction for consideration of public policy, although Daniel Evans' intention was to accomplish what would be for the best interest of all parties concerned, and although the result of the settlement was for the best interest of all parties concerned. The good intention and honesty of purpose of the defendant in the premises does not remove the law's prohibition of such transaction." To the giving of which said instructions for the plaintiff and each of them, the defendant by his counsel then and there excepted.

These instructions amounted to a construction of the statute above quoted and on the facts as claimed by appellant was equivalent to direction to the jury to find against him, which they in fact did. Appellant now insists that these instructions did not correctly declare to the jury the law applicable to the conceded facts. The instructions declare that it was unlawful for appellant to demand or receive the money, and that it may be recovered back in this suit by appellee.

Appellant contends that the prohibition of the statute against judges practicing law applies only to cases actually pending and tried in the court over which he presides, and that there is no prohibition against his practicing law, or engaging in the trial of causes in other courts, nor any violation of public policy involved in such practice. This position may be conceded, so far as it relates to county and probate judges in this State, when the causes they try in other courts have no connection with the business or causes pending in their own courts. But it seems to us to be entirely too narrow a construction to give to the statute to hold, that when an estate is pending in the County or Probate Court for settlement, and that when such settlement is temporarily suspended by the contest of a will, or other collateral questions arising in another court, that the judge of the County or Probate Court can lay aside his character as a judge in the cause and follow the case to another court and there become a partisan attorney for some interest against

Evans v. Funk.

some other interest involved in the common estate, and after that contest is ended, and the case goes back to his own court for final administration, that he can then again assume the impartial and high duties of a judge and settle conflicting interest in the case where he served some of the parties as an attorney, as against the interest of the others. It seems to us the very statement of the claim and propositions suggests the only possible answer that can be given to it.

Nor can it be material whether he was an attorney in the case as a peacemaker or otherwise, or whether his motives were good or bad; if he was there in his own interest and for hire, both the statute and principles of public policy alike forbid that he should again act as a judge in his own court where such cause or any of the matters involved directly or incidentally were to be again considered. We think this prohibition against appellant's right to act as an attorney in the will contest is clearly within the spirit, if not the letter, of the statute. But even without any statute on the subject, the right of any one to act both as judge and attorney at different times in the same cause, or in collateral questions arising out of the same cause of action, is so clearly incompatible with an impartial, pure and unfettered administration of public justice in the courts, and so contrary to the principles of public policy, that such claim can not be allowed under any pretense whatever.

There was no error, therefore, in the instruction which informed the jury that appellant could not lawfully engage in that will controversy, and could have no right to demand or receive the money for his services.

The remaining question is, can appellee recover this money back if he paid it to appellant as his attorney as contended by appellant? It is insisted that if appellant had no right to appear in that case and receive payment therefor that appellee was equally chargeable with that knowledge, and that they are both engaged in an illegal act and "*in pari delicto.*"

This maxim of the law is invoked in aid of the defense. It is true as a general rule that when two or more persons engage in an unlawful enterprise or agree to do an illegal act

or one prohibited by public policy, and spend or pay out money to each other or otherwise in aid of such unlawful enterprise, the law will aid neither, and leave them where they placed themselves. But this general rule has its exceptions arising out of necessity or from unyielding principles of public policy or from the different conditions of the parties. The different degrees of turpitude, immorality, or illegality may be so great between different persons engaged in such acts that the general rule will bend to meet the demands of such case and allow a recovery. In Story's Equity Jurisprudence, Sec. 300, it is said: "In cases where both parties are *in delicto*, concurring in illegal acts, it does not follow that they are *in pari delicto*, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship or undue influence or great inequality in conditions or age, so that his guilt may be far less in degree than that of his associate in the offense. And besides there may be on the part of the court itself, a necessity of supporting the public interest or public policy, in many cases, however reprehensible the acts of the parties may be." In strict harmony with the principles announced by Story are also the following cases: White v. Franklin Bank, 22 Pick. 181; Tracy v. Talmage, 14 N. Y. 162, 193; Quirk v. Thomas, 6 Mich. 111; 1 Smith's Leading Cases, 708.

We think this case falls within this exception to the general rule; and from the strongest necessity of upholding the principles of public policy, in maintaining the purity and honor of the courts of justice, free from all scandal or suspicion of improper conduct on the part of the judges. These parties were not *in pari delicto*. Appellant was a lawyer, and for many years a judge; we must presume as a matter of fact, that he was familiar with the duties and obligations that his profession and his office imposed upon him, and that he knew as a matter of fact that he had no right to take this retainer and appear in that law suit as an attorney, because the very law he was engaged in administering and upholding forbade him that right. In addition to this he occupied a

place of dignity, authority and power over the estates that came before him for settlement. Administrators and executors were in a large sense under his power and control. They had a right to trust him and rely upon his fidelity and impartiality in all things relating to the settlement of estates, and the distribution of the property and money belonging to the estates of others.

The relation between the county or probate judge and executors and administrators as well as of heirs and legatees, is that of confidence, trust and dependence on the one hand, and authority and power on the other hand.

Appellee on the other hand was not a lawyer, and was in a large degree ignorant of the statutes of his State and the principles of the common law, and when involved in litigation, was compelled to seek the assistance of those learned in the law.

Appellant's influence seems to have had a controlling effect upon all parties to this suit. He persuaded Armstrong to pay $7,000 out of the estate to Jack Reddick. He induced appellee to pay him a large sum of money for serving him, while he was at the same time advising and assisting Jack Reddick, whose demands were adversary and antagonistic to his client, John Funk, and to the executor, Wash. Armstrong. We think this influence he exercised over all these parties, and especially over John Funk, was largely due to the fact that he was the probate judge, into whose hands the estate must go at last, whether the will was sustained or defeated.

They were, therefore, not *in pari delicto* in the employment of appellant by appellee, nor in the payment to the one and the receipt by the other, of the $2,500. The situation of the two was widely different, and the difference was largely in favor of appellant.

After a careful and diligent examination of this record and of the questions involved, we fail to find any error, and think, under the evidence and the law, the plaintiff is clearly entitled to recover back the money paid appellee, and the judgment must therefore be affirmed.

*Judgment affirmed.*